UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

| | |
|---|---|
| KIM-CHEE LLC and<br>YUP CHAGI INC. d/b/a MASTER GORINO'S<br>PIL-SUNG TAE-KWON-DO,<br><br>         Plaintiffs,<br><br>- v -<br><br>PHILADELPHIA INDEMNITY INSURANCE<br>COMPANY;<br>PHILADELPHIA CONSOLIDATED HOLDING<br>CORP. a/k/a PHILADELPHIA INSURANCE<br>COMPANIES;<br><br>         Defendants. | ATTORNEY DECLARATION<br><br>Civ. Action No.:<br>1:20-cv-01136-CCR<br><br>*Hon. Christine Reiss, Presiding*<br><br>JURY TRIAL DEMANDED |

CHRISTOPHER M. BERLOTH, under penalty of perjury and pursuant to 28 U.S.C. § 1746, declares the following to be true and correct:

1. I am an attorney duly licensed to practice before the Courts of the State of New York and admitted before this Court. I am a Partner of Duke Holzman Photiadis & Gresens LLP, counsel for Plaintiffs Kim-Chee LLC ("Kim-Chee") and Yup Chagi Inc. d/b/a Master Gorino's Pil-Sung Tae-Kwon-Do ("Gorino") (collectively "Plaintiffs" or the "Insureds"). As such, I am fully familiar with the facts and circumstances set forth in this Declaration.

**INTRODUCTION**

2. This declaration is respectfully submitted on behalf of Plaintiffs in opposition to Defendants Philadelphia Indemnity Insurance Company ("PIIC") and Philadelphia Consolidated Holding Corp. a/k/a Philadelphia Insurance Companies' ("PHC") (each of the foregoing being a

"Defendant" and collectively the "Defendants" or "Philadelphia") motion seeking to dismiss the claims against them pursuant to FEDERAL RULE OF CIVIL PROCEDURE 12(b)(6).

3. For a full recitation of the pertinent facts and issues herein, I respectfully refer the Court to and hereby incorporate the Amended Complaint, as well as all exhibits annexed thereto. (Docs. 1 through 1-6).

## BACKGROUND

I. The Insurance Industry's Adoption of the Virus Exclusion

4. In 2006, the U.S. all-risk insurance industry (headed by the Insurance Services Office ("ISO")) adopted a virus exclusion excluding property losses "caused by or resulting from any virus, bacterium, or other microorganism that induces or is capable of inducing physical distress, illness or disease" (the "Virus Exclusion").

5. Annexed hereto as *Exhibit 1* is a copy of the ISO Virus Exclusion as applicable to New York.

6. The Virus Exclusion has been available and widely used in the industry to exclude coverage for direct physical loss of or damage to property caused by a virus since 2006.

7. For instance, multiple insurers have adopted and used the Virus Exclusion in their policies.

8. Annexed hereto as *Exhibit 2* is an excerpt from a policy issued by The Hartford, and a copy of the Virus Exclusion included therein.

9. Annexed hereto as *Exhibit 3* is an excerpt from a policy issued by Liberty Mutual, and a copy of the Virus Exclusion included therein.

10. Annexed hereto as *Exhibit 4* is an excerpt from a policy issued by Travelers Insurance, and a copy of the Virus Exclusion included therein.

11. Annexed hereto as *Exhibit 5* is an excerpt from a policy issued by Preferred Mutual, and a copy of the Virus Exclusion included therein.

12. Annexed hereto as *Exhibit 6* is an excerpt from a policy issued by AmTrust Insurance, and a copy of the Virus Exclusion included therein.

13. Here, Defendants are members of ISO and have access to ISO forms and exclusions. (See, e.g., Doc. 1-2 [*Policy*], pp. 15, 18, & 21-74 (demonstrating that Defendants' policy forms are copyrighted by the "Insurance Services Office, Inc.").

14. In fact, in the same form of all-risk policy issued to other non-party policyholders, Defendants include the ISO Virus Exclusion.

15. Annexed hereto as *Exhibit 7* is a copy of a policy issued by Defendants to a third-party policyholder in which Defendants expressly include the Virus Exclusion.

16. Annexed hereto as *Exhibit 8* is a copy of another policy issued by Defendants to a third-party policyholder in which Defendants expressly include the Virus Exclusion.

17. The Virus Exclusion Defendants included in third-party policyholders' policies specifically exclude "loss or damage caused by or resulting from any virus, bacterium, or other microorganism that induces or is capable of inducing physical distress, illness, or disease." (Exs. 7 & 8).

18. However, said Virus Exclusion is not part of Plaintiffs' Policy.

19. Further demonstrative of the insurance industry's clear knowledge of the potential for virus- and pandemic-related losses are articles going back over seventeen (17) years.

20. Annexed hereto as *Exhibit 9* is an article titled "Insurers knew the damage a viral pandemic could wreak on businesses. So they excluded coverage."

21. Annexed hereto as *Exhibit 10*, is an article titled "Coverage Unclear for SARS", and dated May 4, 2003.

22. Annexed hereto as *Exhibit 11*, is an article titled "Hotel chain to get payout for SARS-related losses", and dated November 2, 2003

II.     Governmental Orders Issued as a Result of the Virus

23. The novel coronavirus is a virus that causes the disease COVID-19 (collectively the "Virus" or "COVID-19"). The Virus is highly contagious and progressed into and caused a global pandemic. The World Health Organization ("WHO") declared the COVID-19 outbreak a public health emergency of international concern on January 30, 2020, and declared COVID-19 a pandemic on March 11, 2020. On March 13, 2020, a national emergency was declared in the U.S. concerning the COVID-19 outbreak. See CENTERS FOR DISEASE CONTROL AND PREVENTION ("CDC") https://www.cdc.gov/nchs/data/icd/Announcement-New-ICD-code-for-coronavirus-3-18-2020.pdf (last visited Oct. ___, 2020).

24. The presence of COVID-19 caused civil authorities throughout New York to issue executive orders declaring a disaster emergency and requiring the suspension of business operations and use of commercial property (collectively the "NYS Shutdown Orders").

25. Annexed hereto as *Exhibit 12* is a copy of New York State Executive Order 202.

26. Annexed hereto as *Exhibit 13* is a copy of New York State Executive Order 202.3.

27. Annexed hereto as *Exhibit 14* is a copy of New York State Executive Order 202.6.

28. Annexed hereto as *Exhibit 15* is a copy of New York State Executive Order 202.7.

29. Annexed hereto as *Exhibit 16* is a copy of New York State Executive Order 202.8.

30. Annexed hereto as *Exhibit 17* is a copy of New York State Executive Order 202.38.

31. New York City Executive Orders ("NYC Executive Orders"), issued in relation to and to carry out the NYS Shutdown Orders, expressly declared that "the virus *physically is causing property loss and damage*." (Doc. 1-4 [*NYC Executive Orders*], pp. 3 & 6 (emphasis added)).

32. Pursuant to New York State Executive Orders, all non-essential, on-site workers were reduced by: (a) fifty percent (50%), effective March 20, 2020 (Ex. 14); (b) seventy-five percent (75%), effective March 21, 2020 (Ex. 15); and (c) one-hundred percent (100%), effective March 22, 2020 (Ex. 16).

33. In addition, pursuant to Executive Order 202.3, effective March 16, 2020, restaurants, including Plaintiffs' premises in this case, were prohibited from "serving patrons food or beverage on-premises." (Ex. 13).

34. On June 6, 2020, pursuant to Executive Order 202.38, "Executive Order 202.3, as extended, required any restaurant or bar to cease serving patrons food or beverage on-premises" was "modified to the extent necessary to allow a restaurant or bar to serve patrons food or beverage on-premises only in outdoor space." (Ex. 17).

35. States throughout the country issued similar executive orders shutting down businesses. For example, Pennsylvania Governor Wolf issued an executive order "compelling the closure of the physical operations of all non-life-sustaining business." Friends of Danny DeVito v. Wolf, 227 A.3d 872, 876 (Pa. 2020). In Friends of DeVito, the Pennsylvania Supreme Court rejected a challenge to the governor's power to issue the shut-down order, holding that the Virus is a "natural disaster," and finding COVID-19 to be a "catastrophe which *results in substantial damage to property*, hardship, suffering or possible loss of life." Id. at 887-89 (emphasis added). The court explained that "the COVID-19 pandemic is of the same general nature or class as those specifically enumerated" in the Emergency Code, including "hurricane, tornado, storm . . . tidal

wave, earthquake, fire, [and] explosion," and "[t]he COVID-19 pandemic is, by all definitions, a natural disaster and a catastrophe of massive proportions." Id. at 888-89.

36. The court also rejected the petitioner's argument that its business was not in a "disaster area," explaining that COVID-19 is ubiquitous. Id. In particular, the Court explained:

> The virus spreads primarily through person-to-person contact, has an incubation period of up to fourteen days, one in four carriers of the virus are asymptomatic, and the virus can live on surfaces for up to four days. Thus, any location (including Petitioners' businesses) where two or more people can congregate is within the disaster area.

Id. at 889-90; see also id. at 891 ("The virus can live on surfaces for up to four days and can remain in the air within confined areas and structures.").

III.   COVID-19 Contamination

37. Since Friends of DeVito was decided in April 2020, the study and scientific analysis of the Virus has been ongoing. While the initial focus was on person-to-person transmission, current scientific evidence shows that COVID-19 is spread from exposure to air and surfaces in buildings.

38. Annexed hereto as *Exhibit 18* is an article regarding the study of COVID-19 and its properties, titled "'A Smoking Gun': Infectious Coronavirus Retrieved From Hospital Air".

39. Annexed hereto as *Exhibit 19* is an article regarding the study of COVID-19 and its properties, titled "It is Time to Address Airborne Transmission of COVID-19".

40. Annexed hereto as *Exhibit 20* is an article regarding the study of COVID-19 and its properties, titled "New coronavirus stable for hours on surfaces".

41. Annexed hereto as *Exhibit 21* is an article regarding the study of COVID-19 and its properties, titled "COVID-19 Is Transmitted Through Aerosols. We Have Enough Evidence, Not It Is Time to Act".

42. Annexed hereto as *Exhibit 22* is an article regarding the study of COVID-19 and its properties, titled "Large SARS-CoV-2 Outbreak Caused by Asymptomatic Traveler, China".

43. Annexed hereto as *Exhibit 23* is an article regarding the study of COVID-19 and its properties, titled "Closed environments facilitate secondary transmission of coronavirus disease 2019".

44. Annexed hereto as *Exhibit 24* is an article regarding the study of COVID-19 and its properties, titled "Coronavirus can persist in air for hours and on surfaces for days: study".

45. Annexed hereto as *Exhibit 25* is an article regarding the study of COVID-19 and its properties, titled "Yes, the Coronavirus Is in the Air".

46. Studies show that COVID-19 can remain viable and infectious on surfaces for days. (Exs. 24). A recent study found that infection of a person that started with a single elevator button spread the virus to up to seventy-one (71) other people. (Ex. 22).

47. In addition, infectious airborne droplets and smaller aerosols can remain suspended in the air for hours after release, and thereafter settle on surfaces and floors and remain for days, are a major source of COVID-19 transmission. (Exs. 18-25) In addition to talking, coughing, or sneezing, such infection aerosols are released simply by exhaling. These airborne, infectious COVID-19 particles can travel many meters through air current and spread through air ducts and pipes, before settling on a building's surfaces. Id. Based on the foregoing, the risk of infection inside a building is up to nineteen times (19x) higher than open-air environments. (Ex. 23).

## CONCLUSION

48.     Defendants argue the presence of COVID-19 does not and cannot cause "direct physical loss of or damage to the property," but (a) can cite no policy definition that indicates such a narrow meaning, (b) cannot reconcile that restrictive definition with the long list of policy exclusions for circumstances that do not cause physical alteration, and (c) offer no explanation for the existence of a specific policy exclusion for losses resulting from the presence of a virus in the industry and other of Defendants' own policies.

49.     Based on the facts set forth herein and in the Amended Complaint, as well as the arguments set forth in Plaintiffs' concurrently-filed Memorandum of Law, Plaintiffs respectfully request that this Court deny Defendants Motion to Dismiss in its entirety, and grant any such other and further relief as this Court may deem just and proper.

DATED:     October 22, 2020

/s/ *Christopher M. Berloth*
_____
Christopher M. Berloth