UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

KIM-CHEE LLC and
YUP CHAGI INC. d/b/a MASTER GORINO'S
PIL-SUNG TAE-KWON-DO,

                    Plaintiffs,

- v -

PHILADELPHIA INDEMNITY INSURANCE
COMPANY;
PHILADELPHIA CONSOLIDATED HOLDING
CORP. a/k/a PHILADELPHIA INSURANCE
COMPANIES;

                    Defendants.

Civ. Action No.:
1:20-cv-01136-CCR

*Hon. Christine Reiss, Presiding*

JURY TRIAL DEMANDED

## MEMORANDUM OF LAW
## IN OPPOSITION TO DEFENDANTS'
## MOTION TO DISMISS

Buffalo, New York
October 22, 2020

DUKE HOLZMAN PHOTIADIS & GRESENS LLP
Charles C. Ritter, Jr.
Steven W. Klutkowski
Christopher M. Berloth
*Attorneys for Plaintiffs*
701 Seneca Street, Suite 750
Buffalo, New York 14210
critter@dhpglaw.com
sklutkowski@dhpglaw.com
cberloth@dhpglaw.com

# TABLE OF CONTENTS

**TABLE OF CONTENTS**..................................................................................................i

**TABLE OF AUTHORITIES**.......................................................................................iii

**PRELIMINARY STATEMENT**.................................................................................1

**BACKGROUND**.........................................................................................................3

**ARGUMENT**................................................................................................................9

### POINT I:
LEGAL STANDARDS .....................................................................................................9

    A. Motion to Dismiss Standard .................................................................................9

    B. Insurance Policy Interpretation Standard............................................................10

### POINT II:
PLAINTIFFS STATE A VIABLE CLAIM FOR DIRECT PHYSICAL LOSS OF OR DAMAGE TO
THE COVERED PROPERTY AS A RESULT OF THE PRESENCE OF COVID-19 ...........................12

    A. Defendants' interpretation of the Physical Loss Language is inconsistent
    with the terms of the Policy and renders numerous provisions meaningless ..................13

        1. Defendants knowingly failed to include a virus exclusion in the Policy ...................13

        2. Defendants' interpretation of the Policy renders various exclusions and
        limitations in the Policy meaningless and superfluous .................................16

        3. Defendants interpretation of the Policy impermissibly equates "direct
        physical loss" with "direct physical damage" ............................................17

    B. Governing case law supports that COVID-related losses are covered under
    the Policy.........................................................................................................19

        1. The recent COVID-19 Cases support that the presence of COVID-19
        is a covered cause of loss .........................................................................19

        2. Long-standing and well-established case law demonstrates that "physical
        alteration" is not required to establish "direct physical loss of or damage
        to" property .............................................................................................22

        3. The case law cited by Defendants is inapplicable, distinguishable, and does
        not support that physical alteration of property is required by the Physical Loss
        Language .................................................................................................28

### POINT III:
PLAINTIFFS STATE A VIABLE CLAIM FOR CIVIL AUTHORITY INSURANCE COVERAGE .........32

    A. Plaintiffs satisfactorily allege damage to property other than property on
    the insured's premises .....................................................................................33

    B. The CA Orders were issued in response to property damage ............................................33

**POINT IV:**
PLAINTIFFS STATE A VIABLE CLAIM UNDER NEW YORK GBL § 349 .................................................34

    A. Defendants' engaged in consumer-oriented activities in deciding to
    universally deny COVID-related claims regardless of the insureds'
    specific factual circumstances ........................................................................................35

        1. The instant case presents an insurance dispute involving consumer-oriented
        activities .....................................................................................................................35

        2. Defendants conduct was consumer-oriented due to the nature of the agreement,
        their use of uniform, standard forms, and Plaintiffs' lack of bargaining power ..........37

    B. Defendants' engaged in materially false and deceptive activities resulting in
    actual injury to Plaintiffs ................................................................................................38

**POINT V:**
PLAINTIFFS STATE VIABLE CLAIMS AGAINST PCH ............................................................39

**CONCLUSION** ........................................................................................................................45

# TABLE OF AUTHORITIES

**STATUTES/RULES/REGULATIONS:**

FEDERAL RULE OF CIVIL PROCEDURE 12(b)(6) ........................................................ 1, 9, 20, 21, 43

N.Y. GEN. BUS. LAW § 349 ........................................................................................ 35, 36, 37


**CASES:**

10E, LLC v. Travelers Indem. Co. of Conn.,
   2020 WL 5359653 (C.D. Cal. Sep. 2, 2020).................................................... 28, 31

Amusement Indus., Inc. v. Stern,
   693 F. Supp. 2d 327 (S.D.N.Y. 2010)................................................................. 41

Ball v. U.S. Fid. & Guar. Co.,
   1989 WL 135903 (S.D.N.Y. 1989)......................................................................... 5

Bi-Economy Mkt., Inc. v. Harleysvill Ins. Co. of N.Y.,
   10 N.Y.3d 187 (N.Y. 2008) .................................................................................. 1

Blue Springs Dental Care, LLC, et al. v. Owners Insurance Co.,
   20-CV-00383-SRB, ---F. Supp. 3d.---, 2020 WL 5637963 (W.D. Mo. Sep. 21, 2020)........... 21

Broome Cnty. v. The Travelers Indem. Co.,
   125 A.D.3d 1241 (3d Dept. 2015) ....................................................................... 27

Buffalo Xerographix Inc. v. The Hartford Ins. Grp.,
   (W.D.N.Y. Index No. 1:20-cv-00520) (*Hon. Geoffrey Crawford, Presiding*) ........................... 1

City of N.Y. v. Smokes-Spirits.Com, Inc.,
   12 N.Y.3d 616 (N.Y. 2009) ................................................................................ 35

Columbiaknit, Inc. v. Affiliated FM Ins. Co.,
   1999 WL 619100 (D. Or. 1999)........................................................................... 25

Cooper v. Travelers Indem. Co. of Illinois,
   2002 WL 32775680 (N.D. Cal. 2002), aff'd, 113 F. App'x 198 (9th Cir. 2004) ..................... 25

Cortec Indus., Inc. v. Sum Holding L.P.,
   949 F.2d 42 (2d Cir. 1991)..................................................................................... 9

County of Columbia v. Cont. Ins. Co.,
   83 N.Y.2d 618 (N.Y. 1994) ...................................................................... 11, 16, 17

**(CASES CONT.):**

Diesel Barbershop, LLC v. State Farm Lloyds,
  2020 WL 4724305 (W.D. Tex. Aug. 13, 2020) .................................................... 28, 31

Duane Reade, Inc. v. St. Paul Fire and Mar. Ins. Co.,
  411 F.3d 384 (2d Cir. 2005) ........................................................................... 11

Elbit Sys., Ltd. v. Credit Suisse Group,
  917 F. Supp. 2d 217, 226 (S.D.N.Y. 2013) ...................................................... 41, 43

Employers' Liability Assurance Corp. v. Aresty,
  11 A.D.2d 331 (1st Dept. 1960) ...................................................................... 10

Erie R.R. v. Thompkins,
  304 U.S. 64 (1938) ........................................................................................ 10

Essex Ins. Co. v. BloomSouth Flooring Corp.,
  562 F.3d 399 (1st Cir. 2009) ................................................................. 24, 29, 30

Farmers Ins. Co. of Oregon v. Trutanich,
  123 Or. App. 6 (Or. 1993) .............................................................................. 26

Friends of Danny DeVito v. Wolf,
  227 A.3d 872 (Pa. 2020) .............................................................................. 7, 33

Gavrillides Mgmt. Co. v. Michigan Ins. Co.,
  (Mich. Cir. Ct. File No. 20-258-CB) ....................................................... 20, 28, 31

Gen. Mills, Inc. v. Gold Medal Ins. Co.,
  622 N.W.2d 147 (Minn. Ct. App. 2001) ............................................................ 25

Greaves v. Pub. Serv. Mut. Ins. Co.,
  5 N.Y.2d 120 (N.Y. 1959) .............................................................................. 15

Gregory Packaging, Inc. v. Travelers Property Cas. Co.,
  2014 WL 6675934 (D.N.J. 2014) ..................................................................... 24

GSI Commerce Sols., Inc. v. BabyCenter, L.L.C.,
  618 F.3d 204 (2d Cir. 2010) ........................................................................... 11

Harte v. Ocwen Financial Corporation,
  2016 WL 1275045 (E.D.N.Y. 2016) .................................................................. 40

Heredia v. United States,
  887 F. Supp. 77 (S.D.N.Y.1995) ...................................................................... 42

Hutch & Assocs., Inc. v. Erie Ins. Co. of N.Y.,
  (W.D.N.Y. Index No. 1:20-cv-00896-GWC) (*Hon. Geoffrey Crawford, Presiding*) ................ 1

In re Parmalat Securities Litigation,
  594 F. Supp.2d 444 (S.D.N.Y. 2009) ..................................................... 40, 41, 42, 43

**(CASES CONT.):**

In re Parmalat Sec. Litig.,
  375 F. Supp. 2d 278 (S.D.N.Y. 2005) ......................................................... 41, 42, 43

In re September 11 Litig.,
  751 F.3d 86 (2d Cir. 2014) ............................................................................ 4

In re Shulman Transp. Enterprises, Inc.,
  744 F.2d 293 (2d Cir. 1984) ......................................................................... 40

Katz v. Am. Mayflower Life Ins. Co. of N.Y.,
  14 A.D.3d 195 (1st Dept. 2004) ................................................................... 38

La Liberte v. Reid,
  966 F.3d 79 (2d Cir. 2020) ........................................................................... 36

Littlejohn v. City of New York,
  795 F.3d 297 (2d Cir. 2015) ......................................................................... 9

Litwin v. Blackstone Grp., L.P.,
  634 F.3d 706 (2d Cir. 2011) ......................................................................... 10

Malaube, LLC v. Greenwich Insurance Co.,
  (S.D. Fla., Case No. 1:20-cv-22615) ........................................................ 20, 21

Mama Jo's, Inc. v. Sparta Ins. Co.,
  2020 WL 4782369 (11th Cir. Aug. 11, 2020) ............................................. 26, 27

Manley v. AmBase Corp.,
  337 F.3d 237 (2d Cir. 2003) ......................................................................... 17

Maska U.S., Inc. v. Kansa Gen. Ins. Co.,
  198 F.3d 74 (2d Cir. 1999) ........................................................................... 5

Mastellone v. Lightning Ros. Mut. Ins. Co.,
  884 N.E.2d 1130 (Ohio Ct. App. 2008) ..................................................... 26, 27

Matzner v. Seaco Ins. Co.,
  9 Mass. L. Rptr. 41 (Mass. 1998) ............................................................... 25

Mellin v. Northern Security Insurance Company, Inc.,
  167 N.H. 544 (N.H. 2015) ........................................................................... 25

Motorists Mutual Ins. Co. v. Hardinger,
  131 F. App'x 823 (3rd Cir. 2005) ........................................................... 24, 29, 30

Mudpie, Inc. v. Travelers Casualty Ins. Co. of Am.,
  2020 WL 5525171 (N.D. Cal. Sep. 14, 2020) ........................................... 28, 30

**(CASES CONT.):**

Nautilus Group, Inc. v. Allianz Glob. Risks U.S.,
  2012 WL 760940 (W.D. Wash. 2012) ................................................................... 17

New York Univ. v. Cont. Ins. Co.,
  87 N.Y.2d 308 (N.Y. 1995) ................................................................................. 35

Newman Myers Kreines Gross Harris, P.C. v. Great Northern Ins.,
  17 F. Supp. 3d 323 (S.D.N.Y. 2014)........................................................... 28, 29, 30

North State Deli, LLC v. Cincinnati Ins. Co.,
  (N.C. Super. Ct. Case No. 20-CVS-02569, Oct. 7, 2020) .................................. 21, 34

Northville Indus. Corp. v. Natl. Union Fire Ins. Co. of Pittsburgh, Pa.,
  89 N.Y.2d 621 (N.Y. 1997) ................................................................................. 17

Omni Berkshire Corp. v. Wells Fargo Bank, N.A.,
  307 F. Supp. 2d 534 (S.D.N.Y. 2004)..................................................................... 4

Pan Am. World Airways, Inc. v. Aetna Cas. & Sur. Co.,
  368 F. Supp. 1098 (S.D.N.Y. 1973)........................................................... 13, 14, 15

Pan Am. World Airways, Inc. v. Aetna Cas. & Sur. Co.,
  505 F.2d 989 (2d Cir. 1974)................................................................. 14, 15, 16, 38

Pappy's Barber Shops, Inc. v. Farmers Grp., Inc.,
  2020 WL 5500221 (S.D. Cal. Sep. 11, 2020) ..................................................... 28, 31

Parks Real Est. Purch. Grp. v. St. Paul Fire and Mar. Ins. Co.,
  472 F.3d 33 (2d Cir. 2006)........................................................... 4, 10, 11, 23, 24, 31

Pepsico, Inc. v. Winterthur Intl. Am. Ins. Co.,
  24 A.D.3d 743 (2d Dept. 2005) ............................................................. 22, 23, 24, 31

Peter F. Gaito Architecture, LLC v. Simone Dev. Corp.,
  602 F.3d 57 (2d Cir. 2010).................................................................................... 9

Port Authority of N.Y. and N.J. v. Affiliated FM Ins. Co.,
  311 F.3d 226 (3d Cir. 2002)................................................................................ 24

Quadrant Structured Products Co., Ltd. v. Vertin,
  23 N.Y.3d 549 (N.Y. 2014) ............................................................................ 11, 13

Reyes v. Metromedia Software, Inc.,
  840 F. Supp. 2d 752 (S.D.N.Y. 2012)................................................................... 17

Riordan v. Nationwide Mutual Fire Ins. Co.,
  977 F.2d 47 (2d Cir. 1992)................................................................................. 35

**(CASES CONT.):**

Rose's 1, LLC v. Erie Ins. Exch.,
  (D.C. Super. Ct. Case No. 2020 CA 002424 B) ................................................................ 28, 31

Royal Indus. Ltd. v. Kraft Foods, Inc.,
  926 F. Supp. 407 (S.D.N.Y 1996) ............................................................................................ 40

Salvatore's Italian Gardens, Inc. v. Hartford Fire Ins. Co.,
  (W.D.N.Y. Index No. 1:20-cv-00659-LJV) (*Hon. Lawrence J. Vilardo, Presiding*) ................. 1

Sandy Point Dental, PC v. Cincinnati Ins. Co.,
  2020 WL 5630465 (N.D. Ill. Sep. 21, 2020) ....................................................................... 28, 31

SatisPie, LLC v. Travelers Property Casualty Company,
  --- F.Supp.3d ----, 2020 WL 1445874 (W.D.N.Y., March 25, 2020) ................................. 28, 29

Schlamm Stone & Dolan, LLP v. Seneca Ins. Co.,
  800 N.Y.S. 2d 356, 6 Misc. 3d 1037(A) (N.Y. Sup. Ct., N.Y. Cnty. 2005) ........... 22, 23, 24, 31

Sentinel Management Co. v. New Hampshire Ins. Co.,
  563 N.W.2d 296 (Minn. 1997) ........................................................................................... 25, 26

Skanga Energy & Mar. Ltd. v. Arevenca S.A.,
  875 F. Supp. 2d 264 (S.D.N.Y. 2012) ................................................................................ 41, 43

Skanga Energy & Mar. Ltd. v. Petroleos de Venezuela S.A.,
  522 F. App'x 88 (2d Cir. 2013) ......................................................................................... 41, 43

Social Life Magazine, Inc. v. Sentinel Ins. Co., Ltd.,
  (S.D.N.Y. Case No. 20-cv-3311) ................................................................................ 21, 28, 30

STMicroelectronics v. Credit Suisse Group,
  775 F. Supp. 2d 525 (E.D.N.Y. 2011) ......................................................................... 42, 43, 44

Studio 417, Inc. et al. v. The Cincinnati Ins. Co.,
  No. 20-cv-03127, ---F. Supp. 3d.---, 2020 WL 4692385
  (W.D. Mo. Aug. 12, 2020) ............................................................................................ 20, 28, 30

Succo v. First Reliance Std. Life Ins. Co.,
  16 F. App'x 53 (2d Cir. 2001) ................................................................................................. 18

Total Intermodal Services Inc. v. Travelers Prop. Cas. Co. of Am.,
  2018 WL 3829767 (C.D. Cal. 2018) ........................................................................................ 17

TRAVCO Ins. Co. v. Ward,
  715 F. Supp. 2d 699 (E.D. Va. 2010), aff'd, 504 F. App'x 251 (4th Cir. 2013) ........... 24, 29, 30

Turek Ents., Inc. v. State Farm Mut. Auto. Ins. Co.,
  2020 WL 5258484 (E.D. Mich. Sep. 3, 2020) ................................................................ 28, 30, 31

**(CASES CONT.):**

Universal Am. Corp. v. Natl. Union Fire Ins. Co. of Pittsburgh, Pa.,
  25 N.Y.3d 675 (N.Y. 2015) ................................................................................ 10

Universal Image Productions, Inc. v. Chubb Corp.,
  703 F. Supp. 2d 705 (E.D. Mich. 2010)........................................................ 26, 27

Universal Image Productions, Inc. v. Fed. Ins. Co.,
  475 F. App'x 569 (6th Cir. 2012) .......................................................................... 27

Warren v. Mariner Fin., LLC,
  16-CV-221, 2020 WL 4676658 (W.D.N.Y. Aug. 12, 2020) ........................... 35, 37

Western Fire Ins. Co. v. First Presbyterian Church,
  165 Colo. 34 (Colo. 1968) .................................................................................... 26

WTC Captive Ins. Co., Inc. v. Liberty Mut. Fire Ins. Co.,
  549 F. Supp. 2d 555 (S.D.N.Y 2008)..................................................................... 15

**WEBSITES:**

CENTERS FOR DISEASE CONTROL AND PREVENTION,
  https://www.cdc.gov/nchs/data/icd/Announcement-New-ICD-code-for-
  coronavirus-3-18-2020.pdf (last visited Oct. 22, 2020)............................................ 6

CENTERS FOR DISEASE CONTROL AND PREVENTION,
  https://www.cdc.gov/nceh/radiation/emergencies/contamination.htm
  (last visited Oct. 22, 2020)...................................................................................... 16

DICTIONARY.COM,
  https://www.dictionary.com/browse/loss (last visited Oct. 22, 2020) ..................... 18

MERRIAM-WEBSTER,
  https://www.merriam-webster.com/dictionary/loss (last visited Oct. 22, 2020) ...... 18

<u>**PRELIMINARY STATEMENT**</u>

The presence of the novel coronavirus and the disease COVID-19 (collectively "COVID-19" or the "Virus") at an insured's property constitutes "direct physical loss of or damage to" that property. The instant case presents an issue faced by thousands of businessowners across the country: insurance carriers erroneously refusing to cover business interruption losses caused by the presence of the Virus at insured locations. Indeed, there are numerous cases pending before this very Court dealing with this very issue. <u>See, e.g.</u>, <u>Hutch & Assocs., Inc. v. Erie Ins. Co. of N.Y.</u>, (W.D.N.Y. Index No. 1:20-cv-00896-GWC) (*Hon. Geoffrey Crawford, Presiding*); <u>Buffalo Xerographix Inc. v. The Hartford Ins. Grp.</u>, (W.D.N.Y. Index No. 1:20-cv-00520) (*Hon. Geoffrey Crawford, Presiding*); <u>Salvatore's Italian Gardens, Inc. v. Hartford Fire Ins. Co.</u>, (W.D.N.Y. Index No. 1:20-cv-00659-LJV) (*Hon. Lawrence J. Vilardo, Presiding*).

In the instant case, Plaintiffs Kim-Chee LLC ("Kim-Chee") and Yup Chagi Inc. d/b/a Master Gorino's Pil-Sung Tae-Kwon-Do ("Gorino") (collectively "Plaintiffs" or the "Insureds") submit this Memorandum of Law in opposition to Defendants Philadelphia Indemnity Insurance Company ("PIIC") and Philadelphia Consolidated Holding Corp. a/k/a Philadelphia Insurance Companies' ("PCH") (each of the foregoing being a "Defendant" and collectively the "Defendants" or "Philadelphia") motion seeking to dismiss the claims against them pursuant to FEDERAL RULE OF CIVIL PROCEDURE 12(b)(6).

"The purpose served by business interruption coverage cannot be clearer—to ensure that [an insured] has the financial support necessary to sustain its business operation in the event disaster occurred." <u>Bi-Economy Mkt., Inc. v. Harleysvill Ins. Co. of N.Y.</u>, 10 N.Y.3d 187, 194 (N.Y. 2008). Defendants issued Plaintiffs business interruption insurance policies covering "all

risks" that cause "direct physical loss of or damage to" their property,[1] unless specifically excluded or limited. The policies do not exclude or limit virus-related losses even though Defendants issued policies to other policyholders wherein they expressly excluded coverage for virus-related losses.

Plaintiffs dutifully paid policy premiums for all-risk business interruption policies. Yet, now that "disaster occurred," Defendants and insurance carriers nationwide are not providing "the financial support necessary to sustain [the insureds'] business operation," but rather are universally and categorically denying coverage.

For instance, Defendants challenge coverage in the instant case and assert that dismissal of Plaintiffs' claims is required because the presence of COVID-19 is not and/or could never cause "direct physical loss of or damage to" property, as a matter of law. Defendants argue the Physical Loss Language should be interpreted, as a matter of law, to require permanent, observable physical alteration to covered property. Defendants' position is unsound and incorrect.

First, Defendants' interpretation ignores more than 50 years of case law rejecting that the Physical Loss Language requires physical alteration to property, including numerous cases holding that the presence of illness- and disease-causing agents constitutes and/or causes direct physical loss of or damage to property. Despite that long-standing case law, Defendants did not take the simple step of defining "direct physical loss of or damage to" property in the policies as requiring physical alteration.

Second, Defendants' interpretation ignores that the policy specifically excludes other harmful substances that do not cause physical alteration. Defendants' interpretation would render those exclusions meaningless in violation of well-settled principles of contract construction.

---

[1]     The policy language requiring "direct physical loss of or damage to" property shall hereinafter be defined as the "Physical Loss Language".

Third, Defendants' interpretation ignores that, since 2006, the insurance industry, *including Defendants*, have commonly used an exclusion in insurance policies, which are the same as or substantially similar to Plaintiffs' policies, to specifically exclude coverage for "direct physical loss of or damage to" property "caused by or resulting from any virus, bacterium, or other microorganism that induces or is capable of inducing physical distress, illness or disease" (the "Virus Exclusion"). Defendants' conscious and intentional omission of the Virus Exclusion from the policies at issue requires a finding that policies cover virus-related losses.

Pursuant to the subject policies and rules governing contract interpretation, the policies do cover damages and losses resulting from the presence of COVID-19 at the covered property. Based on the foregoing and the arguments detailed below, Defendants' motions to dismiss must be denied because Plaintiffs' allegations, which must be taken as true, state plausible claims for relief. In particular, the presence of the Virus is and/or could cause "direct physical loss of or damage to" property as those terms are interpreted under governing legal authority.

Plaintiffs' allegations are at least sufficient to allow Plaintiffs to proceed to discovery and develop the factual record related to Defendants' conduct in drafting, issuing, and administering the subject insurance policies and claims submitted thereunder, as well as the losses, damages, and impacts resulting from the presence of the Virus at, in, throughout, and on the subject properties.

## **BACKGROUND**

A.   **Factual Background**

The facts relevant to this lawsuit are detailed in Plaintiffs' Complaint ("Complaint") (Doc. 1), which, as discussed below, for the purposes of this motion, must be accepted as true and construed in Plaintiffs' favor.

1.    <u>All Risk Insurance Policies and the Industry-Wide Virus Exclusion</u>

Defendants issued Plaintiffs an all-risk commercial property insurance policy (the "Policy).

> "All risk" insurance is property insurance that covers damage resulting from all
> risks other than those that are specifically excluded from coverage; if a risk is not
> specifically excluded, it is deemed covered. Typical exclusions found in "all risk"
> policies are war, pollution, earthquake, and flood. Over time, the standards of the
> insurance industry have changed in this respect. For example, in the mid to late
> 1990s, the "Y2K" exclusion was introduced to exclude damages resulting from the
> failure of computer systems to recognize the year 2000. Another exclusion that has
> developed in recent years is a mold exclusion, excluding damage caused by mold
> in buildings. The development of the terrorism exclusion after 9/11 is yet another
> example of a change in industry standards. Over time, "all risk" policies will vary.

<u>Omni Berkshire Corp. v. Wells Fargo Bank, N.A.</u>, 307 F. Supp. 2d 534, 538 (S.D.N.Y. 2004). As

explained by the Second Circuit, "[u]nder an all-risk policy, losses caused by *any* fortuitous peril

not specifically excluded under the policy will be covered." <u>Parks Real Est. Purch. Grp. v. St. Paul</u>

<u>Fire and Mar. Ins. Co.</u>, 472 F.3d 33, 41 (2d Cir. 2006); <u>see also</u> <u>In re September 11 Litig.</u>, 751 F.3d

86, 92-93 (2d Cir. 2014) ("The purpose of an all-risk insurance contract is to protect against any

insurable loss not expressly excluded by the insurer or caused by the insured.").

All-risk policies (as opposed to specific peril policies) cover all perils unless specifically

excluded and have evolved over time as insurance companies added exclusions for specific,

otherwise-covered risks. One of the more recently "added" exclusions is for virus-related losses.

In 2006, the U.S. all-risk insurance industry adopted the Virus Exclusion, which excludes

property losses "caused by or resulting from any virus, bacterium, or other microorganism that

induces or is capable of inducing physical distress, illness or disease." (Berloth Decl. Ex. 1). The

creation and adoption of the Virus Exclusion was in response to (i) cases nationwide finding that

the presence of illness- and disease-causing agents constitutes and causes direct physical loss of or

damage to property, (ii) the outbreak of the severe acute respiratory syndrome ("SARS") in other

parts of the world—a viral respiratory illness caused by the SARS-associated coronavirus, and (iii)

business interruption claims and coverage arising therefrom. Id. at Exs. 9-11.

The Virus Exclusion was developed by the Insurance Services Office ("ISO"), "an insurance trade association authorized to act on behalf of its member insurance companies." Maska U.S., Inc. v. Kansa Gen. Ins. Co., 198 F.3d 74, 80 (2d Cir. 1999); Ball v. U.S. Fid. & Guar. Co., 1989 WL 135903, at *1 (S.D.N.Y. 1989) ("ISO is an organization providing services to the property-casualty insurance industry in connection with the adoption of forms and practices."). The Virus Exclusion has been available and widely used in the industry to exclude coverage for direct physical loss of or damage to property caused by a virus since 2006.

Defendants are members of ISO and have access to ISO forms and exclusions. (See, e.g., Doc. 1-2 [*Policy*], pp. 15, 18, & 21-74 (demonstrating that many of Defendants' policy forms are copyrighted by the "Insurance Services Office, Inc."). In fact, using the same all-risk policy forms issued to Plaintiffs, Defendant sold policies to non-party policyholders, but included a virus exclusion specifically excluding "loss or damage caused by or resulting from any virus, bacterium, or other microorganism that induces or is capable of inducing physical distress, illness, or disease." (Berloth Decl. Exs. 7 & 8). Indisputably, Plaintiffs' Policy does not include a virus exclusion.

2.    The Policy

The subject Policy is a commercial property all-risk policy that covers "direct physical loss of or damage to Covered Property at the premises . . . unless the loss is:

      **a.**      excluded in Section **B.**, Exclusions; or
      **b.**      Limited in Paragraph **A.4.**, Limitations; that follow.

(Doc. 1-2 [*Policy*], pp. 21-22). "Covered Property" includes Defendants' premises, buildings, and the contents of the buildings, including equipment, fixtures, and personal property. Id. at 21. The Policy covers all lost income "you sustain due to the necessary suspension of your 'operations'" resulting from such physical loss of or damage to the covered property. Id. at 24.

The Policy does *not*: (a) define what constitutes either "direct physical loss of or damage to" covered property; (b) provide that physical alteration of property is (i) an element or aspect of the definition of "direct physical loss of" or "damage to" property, or (ii) a condition precedent to coverage being afforded therefor; or (c) include any form of a virus exclusion.

The Policy also provides for "Civil Authority" insurance covering lost business income "caused by action of civil authority that prohibits access to the [insured's] premises due to direct physical loss of or damage to property, other than property at the [insured's] premises, caused by or resulting from any Covered Cause of Loss." (Doc. 1-2 [*Policy*], p. 26).

     3.    <u>The Novel Coronavirus, COVID-19, and Authorities' Treatment of the Same</u>

The novel coronavirus is a virus that causes the disease COVID-19. The Virus is highly contagious and progressed into and caused a global pandemic. The World Health Organization ("WHO") declared the COVID-19 outbreak a public health emergency of international concern on January 30, 2020, and declared COVID-19 a pandemic on March 11, 2020. On March 13, 2020, a national emergency was declared in the U.S. concerning the COVID-19 outbreak. <u>See</u> CENTERS FOR DISEASE CONTROL AND PREVENTION ("CDC"), https://www.cdc.gov/nchs/data/icd/Announc ement-New-ICD-code-for-coronavirus-3-18-2020.pdf (last visited Oct. 22, 2020).

The presence of COVID-19 caused civil authorities throughout New York to issue executive orders declaring a disaster emergency and requiring the suspension of business operations and use of commercial property. Pursuant to New York State Executive Orders, all non-essential, on-site workers were reduced by: (a) fifty percent (50%), effective March 20, 2020; (b) seventy-five percent (75%), effective March 21, 2020; and (c) one-hundred percent (100%), effective March 22, 2020 (collectively the "NYS Shutdown Orders"). (Berloth Decl. Exs. 14, 15, & 16). New York City Executive Orders ("NYC Executive Orders"), issued in relation to and to

carry out the NYS Shutdown Orders, expressly declared that "the virus *physically is causing property loss and damage*." (Doc. 1-4 [*NYC Executive Orders*], pp. 3 & 6 (emphasis added)).

States throughout the country issued similar executive orders shutting down businesses. For example, Pennsylvania Governor Wolf issued an executive order "compelling the closure of the physical operations of all non-life-sustaining business." <u>Friends of Danny DeVito v. Wolf</u>, 227 A.3d 872, 876 (Pa. 2020). In <u>Friends of DeVito</u>, the Pennsylvania Supreme Court rejected a challenge to the governor's power to issue the shut-down order, holding that the Virus is a "natural disaster," and finding COVID-19 to be a "catastrophe which *results in substantial damage to property*, hardship, suffering or possible loss of life." <u>Id.</u> at 887-89 (emphasis added). The court explained that "the COVID-19 pandemic is of the same general nature or class as those specifically enumerated" in the Emergency Code, including "hurricane, tornado, storm . . . tidal wave, earthquake, fire, [and] explosion," and "[t]he COVID-19 pandemic is, by all definitions, a natural disaster and a catastrophe of massive proportions." <u>Id.</u> at 888-89.

The court also rejected the petitioner's argument that its business was not in a "disaster area", explaining that COVID-19 is ubiquitous. <u>Id.</u> In particular, the Court explained:

> The virus spreads primarily through person-to-person contact, has an incubation period of up to fourteen days, one in four carriers of the virus are asymptomatic, and the virus can live on surfaces for up to four days. Thus, any location (including Petitioners' businesses) where two or more people can congregate is within the disaster area.

<u>Id.</u> at 889-90; <u>see also id</u>. at 891 ("The virus can live on surfaces for up to four days and can remain in the air within confined areas and structures.").

Since <u>Friends of DeVito</u> was decided in April 2020, the study and scientific analysis of the Virus has been ongoing. While the initial focus was on person-to-person transmission, current scientific evidence shows that COVID-19 is spread from exposure to air and surfaces in buildings.

(Berloth Decl. Exs. 18-25). Studies show that COVID-19 can remain viable and infectious on surfaces for days. Id. at Ex. 20. A recent study found that infection of a person that started with a single elevator button spread the virus to up to seventy-one (71) other people. Id. at Ex. 22.

A major source of COVID-19 transmission is infectious airborne droplets and smaller aerosols, which can remain suspended in the air for hours after release, thereafter settle on surfaces and floors, and so remain for days. Id. at Exs. 18-25. In addition to talking, coughing, or sneezing, such infection aerosols are released simply by exhaling. These airborne, infectious COVID-19 particles can travel many meters through air current and spread through air ducts and pipes, before settling on a building's surfaces. Id. Based on the foregoing, the risk of infection inside a building is up to nineteen times (19x) higher than open-air environments. Id. at Ex. 23.

    4.    <u>The Loss and Denial of Claim</u>

COVID-19 was present at, in, throughout, and on Plaintiffs' covered property, including Plaintiffs' premises, buildings, contents, equipment, fixtures, and personal property (collectively "Covered Property").[2] (Doc. 1 [*Complaint*], ¶¶ 48-65). The presence of the Virus is and causes direct physical loss of and/or damage to Plaintiffs' Covered Property. Id.

In March 2020, Plaintiffs ceased business operations and suffered business interruption losses as a result of the presence of COVID-19 at their Covered Property, the resulting direct physical loss of and/or damage to Plaintiffs' Covered Property, and the NYS Shutdown Orders relating to such loss and damage.

Plaintiffs filed claims under the Policy seeking coverage for losses related to the Virus. Plaintiffs received a denial letter from Defendants, providing, *inter alia*: "We regret to advise you

---

[2]    The definition of "Covered Property" is for convenience of reference only, and not intended to prejudice Plaintiffs in their claims by including or excluding by reference items that may or may not be "covered" under the Policy.

that there is no coverage for business income. In order for the business income coverage to be triggered, there must be <u>direct physical damage</u> to covered property, caused by a Covered Cause of Loss." (Doc. 1-6 [*Denial*]) (emphasis in original).

## B.   <u>Procedural History</u>

On August 24, 2020, Plaintiffs initiated this action by filing a Summons and Complaint in the State of New York Supreme Court. (Doc. 1). On October 8, 2020, Defendants filed a motion seeking to dismiss Plaintiffs' claims pursuant to FEDERAL RULE OF CIVIL PROCEDURE 12(b)(6) (collectively the "RULES" or each a "RULE") (the "Motion to Dismiss"). (Doc. 12).

For the reasons discussed below, Defendant's Motion to Dismiss must be denied.

## <u>ARGUMENT</u>
### <u>POINT I</u>
### LEGAL STANDARDS

## A.   <u>Motion to Dismiss Standard</u>

"On a motion to dismiss, all factual allegations in the complaint are accepted as true and all inferences are drawn in the plaintiff's favor." <u>Littlejohn v. City of New York</u>, 795 F.3d 297, 306 (2d Cir. 2015) (citations omitted). "[T]he complaint is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference." <u>Cortec Indus., Inc. v. Sum Holding L.P.</u>, 949 F.2d 42, 47 (2d Cir. 1991).

"[A] motion to dismiss does not involve consideration of whether a plaintiff will ultimately prevail on the merits, but instead solely whether the claimant is entitled to offer evidence in support of his claims." <u>Peter F. Gaito Architecture, LLC v. Simone Dev. Corp.</u>, 602 F.3d 57, 65 (2d Cir. 2010) (quotations and citations omitted).

> To survive a motion to dismiss, a complaint must plead enough facts to state a claim to relief that is plausible on its face. A claim has facial plausibility when the plaintiff

pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.

Litwin v. Blackstone Grp., L.P., 634 F.3d 706, 715 (2d Cir. 2011).

Based on the arguments set forth below, Defendants' motion to dismiss must be denied because (i) Plaintiffs' allegations, which must be taken as true, state plausible claims for relief and (ii) Defendants' repeated assertions that Plaintiffs "fail to plead" certain elemental facts are false. The Policy provides coverage for COVID-19-related business interruption losses. Specifically, the presence of the Virus is, and causes, "direct physical loss of or damage to" Covered Property pursuant to governing legal authority and established legal principles.

At the very least, Plaintiffs' allegations are sufficient to allow Plaintiffs to proceed to discovery and develop the factual record related to (a) Defendants' conduct in drafting, issuing, and administering the subject insurance policies (and the systemic inconsistencies and failures thereof) and claims submitted thereunder, as well as (b) the loss and damage resulting from the presence of COVID-19 at, in, throughout, and on the Covered Property.

**B.**   **Insurance Policy Interpretation Standard**

New York substantive law applies because there are no federal questions and because New York has the greatest interest in the instant litigation. See Erie R.R. v. Thompkins, 304 U.S. 64, 78 (1938); Employers' Liability Assurance Corp. v. Aresty, 11 A.D.2d 331, 333 (1st Dept. 1960) (holding that New York law applies in interpreting insurance policies). Under New York Law, "[a]n insurance agreement is subject to principles of contract interpretation." Universal Am. Corp. v. Natl. Union Fire Ins. Co. of Pittsburgh, Pa., 25 N.Y.3d 675, 680 (N.Y. 2015). "When a dispute arises involving the terms of an insurance contract, New York insurance law provides that an insurance contract is interpreted to give effect to the intent of the parties as expressed in the clear language of the contract." Parks Real Estate, 472 F.3d at 42 (quotations and citations omitted).

"Whether a contract is ambiguous is a threshold question of law to be determined by the court." Duane Reade, Inc. v. St. Paul Fire and Mar. Ins. Co., 411 F.3d 384, 390 (2d Cir. 2005).

"An ambiguity exists where the terms of an insurance contract could suggest more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." Parks Real Estate, 472 F.3d at 42 (quotations and citations omitted).

"Under New York law, moreover, a policy must . . . be construed in favor of the insured, and ambiguities, if any, are to be resolved in the insured's favor and against the insurer." Duane Reade, 411 F.3d at 390; see also Parks Real Estate, 472 F.3d at 42 ("[i]f the language of the policy is doubtful or uncertain in its meaning, any ambiguity must be resolved in favor of the insured and against the insurer.").

Moreover, "[a]n insurance contract should not be read so that some provisions are rendered meaningless." County of Columbia v. Cont. Ins. Co., 83 N.Y.2d 618, 628 (N.Y. 1994). Rather, "[t]he rules of contract construction require [the Court] to adopt an interpretation which gives meaning to every provision of the contract." GSI Commerce Sols., Inc. v. BabyCenter, L.L.C., 618 F.3d 204, 214 (2d Cir. 2010).

As explained by the New York Court of Appeals, a crucial principle of insurance contract interpretation is that:

> if parties to a contract omit terms—particularly, terms that are readily found in other, similar contracts—*the inescapable conclusion is that the parties intended the omission*. The maxim *expressio unius est exclusio alterius*, as used in the interpretation of contracts, supports precisely this conclusion.

Quadrant Structured Products Co., Ltd. v. Vertin, 23 N.Y.3d 549, 560 (N.Y. 2014) (emphasis in underline and italics added). This rule not only defeats Defendants' present motion, but supports

the eventual grant of summary judgment in Plaintiffs' favor.

As discussed below, these governing principals of contract interpretation, as applied to the subject Policy, do not support Defendants' interpretation that "direct physical loss of or damage to" property requires observable physical alteration; rather, they support that the presence of COVID-19 is inherently, and causes, "direct physical loss of or damage to" property. As evidenced by (i) the industry's adoption of the Virus Exclusion and (ii) the policy interpretation accepted by numerous learned courts across the Country on this very issue (see infra, POINT II.B.2), the Policy must be construed in Plaintiffs' favor such that the unavoidable conclusion is that the Policy provides coverage for Plaintiffs' Virus-related business interruption losses.

POINT II

PLAINTIFFS STATE A VIABLE CLAIM FOR DIRECT PHYSICAL LOSS OF OR DAMAGE TO THE COVERED PROPERTY AS A RESULT OF THE PRESENCE OF COVID-19

Defendants argue that Plaintiffs' claim must be dismissed because presence of COVID-19 is not, and cannot cause, "direct physical loss of or damage to" the Covered Property, as a matter of law. Defendants' claim (a) ignores the applicable and well-established case law and (b) is based on Defendants' erroneous interpretation that the Physical Loss Language requires observable alteration to the physical integrity of the Covered Property.

Defendants' argument requires the Court to: (i) ignore that the insurance industry created and adopted the Virus Exclusion because the Physical Loss Language affords coverage for virus-related losses absent an exclusion; (ii) ignore decades of case law rejecting that the Physical Loss Language requires a physical alteration to property; (iii) read definitions into the Policy despite Defendants' omission of the same; and (iv) ignore that Defendants actively included the Virus exclusion in certain policies *while omitting that same exclusion in Plaintiffs' Policy*.

**A.** **Defendants' interpretation of the Physical Loss Language is inconsistent with the terms of the Policy and renders numerous provisions meaningless.**

Defendants' arguments—that "direct physical loss of or damage to" property does not include losses causes by COVID-19 because it requires physical alteration to the Covered Property—are inconsistent with the rest of the Policy and violate controlling principals of contractual interpretation. Specifically, Defendants cannot overcome that: (1) they failed to include a virus exclusion in the Policy despite (a) their knowledge of the existence of virus exclusions, and (b) their use of virus exclusions in policies issued to other policyholders; (2) their reading of the Policy renders various exclusions and limitations in the Policy meaningless and superfluous; and (3) their interpretation of the Physical Loss Language equates "direct physical loss" with "direct physical damage," thereby reading one of the provisions out of the Policy.

      1.      <u>Defendants knowingly failed to include a virus exclusion in the Policy.</u>

New York law is well-settled:

> if parties to a contract omit terms—particularly, terms that are readily found in other, similar contracts—*<u>the inescapable conclusion is that the parties intended the omission</u>*. The maxim *expressio unius est exclusio alterius*, as used in the interpretation of contracts, supports precisely this conclusion.

<u>Quadrant Structured</u>, 23 N.Y.3d at 560 (emphasis underlined and italicized added).

This rule was applied by the Southern District of New York where the court considered a coverage dispute under all-risk policies for losses arising from an aircraft hijacking. <u>Pan Am. World Airways, Inc. v. Aetna Cas. & Sur. Co.</u>, 368 F. Supp. 1098 (S.D.N.Y. 1973). The insurers argued that the loss was not covered due to exclusions, including exclusions for military seizure, war, insurrection, and civil commotion. <u>Id.</u> at 1117. The court rejected the insurers' arguments. <u>Id.</u>

The Court explained that "hijacking risk" was known in the industry, that exclusions specific to hijacking risks were developed and adopted in the industry, and that inclusion of a

hijacking exclusion in the subject all-risk policies would have unambiguously excluded the loss at issue. Id. at 1119-1121. The court further explained that the industry's development of the hijacking exclusion evidenced that "insurers themselves recognized the ambiguities in their ancient, boiler-plate clauses and themselves exhibited the consequent uncertainties." Id. at 1118.

The Pan Am. court therefore held that the all-risk policies covered the loss arising from hijacking, finding it "significant" that (1) the risk was "well known when the insurance was written", (2) there were "expressions known to the insurers, considered by them, and used in other policies by some of them or others in the industry that described this kind of risk with clarity and precision", and (3) the insurers did not include a hijacking exclusion in the policies. Id. In sum, the policy covered the loss because the carrier did not include the known exclusion for such losses.

The Second Circuit affirmed the decision, holding, in pertinent part:

> The maxim contra proferentem receives added force in this case because the all risk insurers knew that their exclusions were ambiguous in the context of a political hijacking, and *they knew of but did not employ exclusionary terms used by other all risk insurers which would have clarified the ambiguity* . . . . [I]t is not sufficient for the all risk insurers' case for them to offer a reasonable interpretation under which the loss is excluded; they must demonstrate that an interpretation favoring them is *the only reasonable reading* of at least one of the relevant terms of exclusion.
>
> *Contra proferentem has special relevance as a rule of construction <u>when an insurer fails to use apt words to exclude a known risk</u>*. The evidence indicates that the risk of a hijacking was well known to the all risk insurers . . . .

Pan Am. World Airways, Inc. v. Aetna Cas. & Sur. Co., 505 F.2d 989, 1000 (2d Cir. 1974) (emphasis added) (hereinafter "Pan Am. II"). The Second Circuit explained that "various clauses which would have excluded the present loss were in common use" and that, "[w]hen the all risk insurers failed to exclude" losses arising from hi-jacking, "they acted at their own peril." Id.

Here, as in Pan Am., Defendants and the rest of the all-risk insurance industry recognized that the presence of a virus constitutes "physical loss of or damage to" property. (Berloth Decl. Exs. 2-6). It is undisputed that the Virus Exclusion was created, adopted by, and available to

Defendants and other insurers nationwide since 2006. Like the hijacking exclusion in Pan Am., insurers in the industry have included the Virus Exclusion in similar all-risk property casualty policies. Id. Here, Defendants chose not to include the Virus Exclusion and, as explained by the Second Circuit, "acted at their own peril." Pan Am. II, 505 F.2d at 1000.

The rationale for the Virus Exclusion to be created, adopted, and included in such policies is that the presence of a virus is covered because it is or causes "direct physical loss of or damage to" property. Thus, the industry developed a Virus Exclusion to be used by insurers who intend to exclude virus-related losses from coverage. Id.

Defendants decided not to use that known Virus Exclusion "at their own peril." Pan Am. II, 505 F.2d at 1000; see also WTC Captive Ins. Co., Inc. v. Liberty Mut. Fire Ins. Co., 549 F. Supp. 2d 555 (S.D.N.Y 2008) ("enough was known by the underwriters to enable them to write specific exclusions if, indeed, they truly intended to exclude specified risks . . . . *The [] Insurers failed to write such a specific exclusion. They cannot now ask the court to remedy their failure.*" (emphasis added)); Greaves v. Pub. Serv. Mut. Ins. Co., 5 N.Y.2d 120, 125 (N.Y. 1959) ("this policy was written by the insurer and any ambiguity is to be resolved against it. *If the intent was to exclude liability* to any injured person who was covered by any workmen's compensation insurance *it would have been easy to say so*." (emphasis added)). Defendants' omission of the industry-wide Virus Exclusion from the Policy requires a finding that the Policy covers virus related losses.

Moreover, Defendants were not merely aware of the existence of virus exclusions, they actually included the Virus Exclusion in similar all-risk policies issued to other policyholders. (Berloth Decl. Exs. 7 & 8). Thus, the instant case presents an even more compelling situation than Pan Am. and WTC because Defendants did not merely "[know] of but did not employ exclusionary terms used by *other* all risk insurers which would have clarified the ambiguity." Pan Am. II, 505

F.2d at 1000 (emphasis added). Instead, Defendants "knew of but did not employ exclusionary terms" *they actually used directly* "which would have clarified the ambiguity." Id.

2.    Defendants' interpretation of the Policy renders various exclusions and limitations in the Policy meaningless and superfluous.

Under Defendants' interpretation of the Physical Loss Language—as requiring physical alteration of property—specific exclusions and limitations in the Policy would be superfluous and rendered meaningless, in violation of well-settled rules of contractual interpretation. County of Columbia, 83 N.Y.2d at 628 ("An insurance contract should not be read so that some provisions are rendered meaningless."). For instance, the Policy specifically excludes or limits from coverage numerous risks that do not alter the physical integrity of property, including: (i) "[a]sh, dust, or particulate matter"; (ii) "radiation"; (iii) "radioactive contamination"; (iv) "Dampness or dryness of atmosphere"; (v) "Smog"; (vi) "Smoke"; (vii) "vapor"; and (viii) "gas" (the foregoing being defined as examples of "*Non-Physically Altering Losses*"). (Doc. 1-2 [*Policy*], pp. 29-32). Those exclusions and limitations all apply to the same coverage at issue here, requiring "direct physical loss of or damage to" the Property. Id.

For example, radiation (a) causes illness, but "cannot be seen, smelled, felt, or tasted," (b) can contaminate, among other things, "air, water, surfaces, soil, plants, buildings, people," (c) "can spread the contamination by touching surfaces, sitting in a chair, or even walking through a house," and (d) can be spread from person-to-person or from the "surfaces that they touch." (See CENTERS FOR DISEASE CONTROL AND PREVENTION, https://www.cdc.gov/nceh/radiation/ emergencies/contamination.htm (last visited Oct. 22, 2020). The Virus is directly analogous to radiation, insomuch as both cause "direct physical loss of or damage to the property"; however, radiation, unlike the Virus, is expressly excluded from coverage under the same all-risk policy.

If the Physical Loss Language necessitates a physical alteration of property, then risks such as radiation would not require specific exclusions. The Policy "should not be read so that [these] provisions are rendered meaningless." County of Columbia, 83 N.Y.2d at 628.

3.   Defendants interpretation of the Policy impermissibly equates "direct physical loss" with "direct physical damage."

Defendants' interpretation that "direct physical loss of or damage to" property includes only physical alteration to property ignores that the Policy expressly includes both "direct physical loss of **_or_** damage to Covered Property at the premises." (Doc. 1-2 [*Policy*], p. 21 (emphasis added)). The Court must give meaning to both the terms "loss of" and "damage to." Northville Indus. Corp. v. Natl. Union Fire Ins. Co. of Pittsburgh, Pa., 89 N.Y.2d 621, 632 (N.Y. 1997) ("[C]ourts, in interpreting insurance policies, should strive to give meaning to every sentence, clause, and word of a contract of insurance.").

If Defendants' interpretation is accepted—that both "direct physical loss of" and "direct physical damage to" are singularly defined as physical alteration of the property—then either "loss of" or "damage to" would be rendered meaningless. That interpretation would run afoul of "the cardinal rule that a contract should not be read to render any provision superfluous." Reyes v. Metromedia Software, Inc., 840 F. Supp. 2d 752, 756 (S.D.N.Y. 2012); see Manley v. AmBase Corp., 337 F.3d 237, 250 (2d Cir. 2003).

For example, in Total Intermodal Services Inc. v. Travelers Prop. Cas. Co. of Am., 2018 WL 3829767 (C.D. Cal. 2018), the court rejected that "direct physical loss of or damage to" property meant only "damage to" property. The court held:

> to interpret "physical loss of" as requiring "damage to" would render meaningless the "or damage to" portion of the same clause, thereby violating a black-letter canon of contract interpretation—that every word be given a meaning.

Id. at *3; see also Nautilus Group, Inc. v. Allianz Glob. Risks U.S., 2012 WL 760940, at *7 (W.D.

Wash. 2012) ("First, if 'physical loss' was interpreted to mean 'damage,' then one or the other would be superfluous. The fact that they are both included in the grant of coverage evidences an understanding that physical loss means something other than damage.").

Even if the language "direct physical damage to" required physical alteration—which Plaintiffs contest—"direct physical loss of" must be given its own meaning. Commonly accepted definitions of "loss" include (1) "detriment, disadvantage, or deprivation from failure to keep, have, or get"; (2) "the state of being deprived of or of being without something that one has had"; and (3) "the act of losing possession : DEPRIVATION." DICTIONARY.COM, https://www.dictionary.com/browse/loss (last visited Oct. 22, 2020)); MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/loss (last visited Oct. 22, 2020)); see also Succo v. First Reliance Std. Life Ins. Co., 16 F. App'x 53, 55 (2d Cir. 2001) ("A non-legal dictionary can supply the everyday, common meaning.").

Therefore, pursuant to the plain meaning of "loss," "direct physical loss of" includes physical deprivation of the Covered Property. It cannot be disputed that Plaintiffs' adequately alleged that the presence of COVID-19 at the covered property deprived Plaintiffs of that property, making it unsafe and unusable. (Doc. 1 [*Complaint*], ¶¶ 48-65).

Simply put, reading "direct physical loss" as separate and distinct from "direct physical damage" explains why the Policy also contains express exclusions and limitations for certain *Non-Physically Altering Losses*. Insurers include such exclusionary language because the inclusion of "direct physical loss of" and "direct physical damage to" inherently encompass "all risks" covered under the "all risk" Policy. Thus, Defendants' Motion to Dismiss should be denied.

**B.**     **Governing case law supports that COVID-related losses are covered under the Policy.**

Defendants' Motion to Dismiss should be denied because: (1) the courts which have determined this same COVID-19 motion to dismiss, on factually analogous grounds, ruled in the insureds' favor; (2) those decisions are consistent with the long-standing case law demonstrating that physical alteration of property is not required by the Physical Loss Language; and (3) the case law cited by Defendants is inapplicable as it is both legally and factually distinguishable.

      1.     The recent COVID-19 Cases support that the presence of COVID-19 is a covered cause of loss.

The United States District Court for the Western District of Missouri recently denied virtually the exact motion to dismiss as is currently before this Court, applying the same constructs of contractual interpretation identified by the Second Circuit and New York Court of Appeals. Studio 417, Inc. et al. v. The Cincinnati Ins. Co., No. 20-cv-03127, --- F. Supp. 3d. ---, 2020 WL 4692385 (W.D. Mo. Aug. 12, 2020). In Studio 417, the all-risk policy covered "accidental [direct] physical loss or accidental [direct] physical damage." Id. at *1 (alterations in original). The insured filed a lawsuit seeking coverage "for losses caused by the Coronavirus ('COVID-19')." Id. at *1-2. Similar to Plaintiffs' allegations herein, the insured alleged that COVID-19 was present at the covered properties, rendered the property and property in its vicinity "unsafe and unusable," forced the insureds "to suspend or reduce business at their covered premises," and that government orders required suspension of business operations. Id. at *2.

Just as Defendants do here, the Studio 417 insurance company filed a motion to dismiss under Rule 12(b)(6), claiming failure to allege "direct physical loss" because "direct physical loss requires actual, tangible, permanent, physical alteration of property." Id. at *4.

Applying the same contractual interpretation principles outlined in Point II.A, supra, the court held that coverage may exist "even absent a physical alteration." Id. at *5. The court

explained: (a) the plaintiffs sufficiently pleaded "direct physical loss to the premises and property," because "'COVID-19 'is a physical substance,' that it 'live[s] on' and is 'active on inert physical surfaces,' and is also 'emitted into the air'"; (b) COVID-19 "attached to and deprived Plaintiffs of their property, making it 'unsafe and unusable'"; and (c) "the Plaintiffs expressly allege[d] physical contamination." Id. at *4-6.

In addition, the court held that because the policy covered both "accidental physical loss *or* accidental physical damage," the insurer "conflates 'loss' and 'damage' in support of its argument that the Policies require a tangible, physical alteration." Id. at *5 (emphasis in original). The court ruled that it "must give meaning to both terms" and "'if 'physical loss' was interpreted to mean 'damage,' then one or the other would be superfluous." Id.

The Court also rejected the use of the transcripts from the Social Life preliminary injunction and Gavrillides motion for summary judgment relied on by Defendants. The court held:

> the presence of COVID-19 on premises, as is alleged here, is not a benign condition.
> Regardless of the allegations in Social Life or other cases, *Plaintiffs here have plausibly alleged that COVID-19 particles attached to and damaged their property, which made their premises unsafe and unusable. This is enough to survive a motion to dismiss*. . . .
> Gavrillides is *distinguishable*, in part, because the court recognized that "the complaint also states *a[t] no time has COVID-19 entered the Soup Shop of the Bistro* . . . and in fact, states that it has never been present in either location."

Studio 417 at *6 and n. 5 (emphasis added).

The Studio 417 decision was favorably cited by the Southern District of Florida, where the court decided a motion on another COVID-19 matter, albeit one factually distinguishable from both the instant case and Studio 417. See Malaube, LLC v. Greenwich Insurance Co., (S.D. Fla., Case No. 1:20-cv-22615). While Defendants cite Malaube in support of their motion—because the court ultimately granted the defendant/insurer's motion to dismiss—the court cited and approved the Studio 417 analysis. The Malaube court then found its case "materially different because

- 20 -

Plaintiff has not alleged any physical harm. There is no allegation, for example, that COVID-19 was physically present on the premises." Id. at 15.

An even more recent federal court decision reinforces the Studio 417 decision. See Blue Springs Dental Care, LLC, et al. v. Owners Insurance Co., 20-CV-00383-SRB, ---F. Supp. 3d.---, 2020 WL 5637963, at *1 (W.D. Mo. Sep. 21, 2020). The court denied the insurer's motion to dismiss the insureds' lawsuit pursuant to RULE 12(b)(6), finding that the insureds "adequately stated a claim for a direct physical loss." Id. at *4. "Taking Plaintiffs' fact allegations as true, as the Court must at this stage, and after drawing reasonable inferences from those facts in their favor, Plaintiffs plausibly allege that COVID-19 physically attached itself to their dental clinics, thereby depriving them of the possession and use of those insured properties." Id. at *4 (citations omitted).

A North Carolina State Court went one step further and granted summary judgment to the plaintiff-insureds for their COVID-related loss. North State Deli, LLC v. Cincinnati Ins. Co., (N.C. Super. Ct. Case No. 20-CVS-02569, Oct. 7, 2020).[3] The court applied the ordinary meaning of the term loss and accepted that it "includes the inability to use or possess something in the real, material, or bodily world[.]" Id. at 6. The court applied the same analysis as Studio 417, and explained that the carrier's "argument that the Policies require alteration conflates 'physical loss' and 'physical damage.'" Id. at 7.

Here, like Studio 417, Blue Springs, and North State Deli, COVID-19 was present at the covered properties and constituted, or caused, physical loss of or damage to the property. (Doc. 1 [Complaint], ¶¶ 48-65). Based on the foregoing, Plaintiffs request that the Court follow the above well-reasoned decisions and analysis and deny Defendants' Motion to Dismiss.

---

[3]        A copy of the North State Deli decision is annexed to this memorandum as *Exhibit A*.

2.  Long-standing and well-established case law demonstrates that "physical alteration" is not required to establish "direct physical loss of or damage to" property.

Defendants' coverage position ignores more than fifty (50) years of case law rejecting the argument that the Physical Loss Language requires a perceivable physical alteration to property.

New York courts examined this very issue in Pepsico, Inc. v. Winterthur Intl. Am. Ins. Co., 24 A.D.3d 743 (2d Dept. 2005) and Schlamm Stone & Dolan, LLP v. Seneca Ins. Co., 800 N.Y.S. 2d 356, 6 Misc. 3d 1037(A) (N.Y. Sup. Ct., N.Y. Cnty. 2005). The Pepsico court rejected an insurance carrier's contention that covered property was "not 'physically damaged' under the all-risk first-party property insurance policy" because the physical structure of the property was not altered. 24 A.D.3d at 744. Specifically, the court explained that "'physical damages' [were] not defined in the policy[.]" Id. The court expressly rejected the insurer's argument, explaining: "we disagree . . . that to prove 'physical damages' the plaintiffs [insureds] must prove that 'there has been a distinct demonstrable alteration of the physical structure of the [covered property.]" Id. (original alterations omitted).

Similarly, the Schlamm Stone court examined a loss resulting from the aftermath of the September 11 terrorist attacks and evinced the same legal principle. See 800 6 Misc. 3d 1037(A) at *1-2. The plaintiff-insured filed an insurance claim based on "dust and other particles which remained in the air [and] made it difficult to remain in the offices for a long period of time." Id. at *1. The defendant-carrier raised the same argument as Defendants here, to wit "that plaintiff [] failed to allege any damage to its property." Id. at *4.

Thus, "the central question before the court [. . . was] whether 'property damage' as used in the Policy includes noxious particles in an insured premises." Id. The court held:

> Under the Policy, particles that have settled in the carpets and on other surfaces in plaintiff's offices *constitutes property damage*. The carpets and other surfaces are

> property of plaintiff, and the presence of noxious particles thereon *clearly impairs plaintiff's ability to make use of them*.

Id. (emphasis added). The court went on to further explain that "the presence of noxious particles, both in the air and on surfaces in plaintiff's premises, would constitute property damage under the terms of the policy." Id.

Like the "noxious particles" in Schlamm Stone, which "clearly impair[ed] plaintiff's ability to make use" of its property, id., the presence of the Virus—which caused over 200,000 deaths in the United States—impairs and eliminates an insured's ability to make use of its property.

Pepsico and Schlamm Stone are hardly outlier decisions; the Second Circuit adopted their reasoning. See Parks Real Estate, 472 F.3d at 38. In Parks Real Estate, the Second Circuit applied New York law in considering whether an all-risk policy provided coverage for "a cloud of noxious particulate matter" where the policy covered "direct physical loss or damage except as indicated in the Exclusions[.]" 472 F.3d at 37. The particulate matter contained "known toxins or carcinogens" that could cause a "long-term risk to occupants." Id. at 38. The Second Circuit held that "contact of the airborne particulate matter with the Property" is a covered cause of loss under the language of the "all-risk" policy. Id.

Accordingly, the Second Circuit expressly ruled the mere presence of harmful airborne particles satisfied the threshold question as to whether there was "direct physical loss or damage except as indicated in the Exclusions[.]" See id. at 38, 48-49. The court's analysis is directly applicable here. "Under an all-risk policy, 'losses caused by *any* fortuitous peril not specifically excluded under the policy will be covered.'" Id. at 41 (emphasis in original). The presence of the Virus at, in, throughout, and on Plaintiffs' property satisfies the "any fortuitous peril" standard. The Virus, by its very nature, constitutes a "noxious particle," and is thereby covered.

Cases across the country have ruled in the same manner as <u>Pepsico</u>, <u>Schlamm Stone</u>, and <u>Parks Real Estate</u> (including additional cases applying New York law). These courts rejected that insurance policies with the operative "direct physical loss of or damage to" language do not provide coverage for losses arising from substances and materials that do not "physically alter property"—including the presence of illness- and disease-causing agents such as the e-coli bacteria, ammonia, asbestos fibers, and carbon monoxide. The following decisions (the "*Analogous Cases*") evidence the rejection of the argument that "direct physical loss of or damage to" property requires physical alteration to the property:

- <u>Essex Ins. Co. v. BloomSouth Flooring Corp.</u>, 562 F.3d 399 (1st Cir. 2009). The First Circuit held that "odor can constitute physical injury to property" and "allegations that an unwanted odor permeated the building and resulted in a loss of use of the building are reasonably susceptible to an interpretation that physical injury to property has been claimed." <u>Id.</u> at 406.

- <u>Port Authority of N.Y. and N.J. v. Affiliated FM Ins. Co.</u>, 311 F.3d 226 (3d Cir. 2002). Applying New York and New Jersey law, the Third Circuit held that if "asbestos in the air of a building is such as to make the structure uninhabitable and unusable, then there has been a distinct loss to its owner," and there has been a "physical loss or damage." <u>Id.</u> at 236. "The effect of asbestos fibers in such quantity is comparable to that of fire, water or smoke on a structure's use and function." <u>Id.</u>

- <u>Motorists Mutual Ins. Co. v. Hardinger</u>, 131 F. App'x 823 (3rd Cir. 2005). The Third Circuit held the presence of "e-coli bacteria" can constitute "direct physical loss." <u>Id.</u> at 825. The court found "a genuine issue of fact whether the functionality of the [insured's] property was nearly eliminated or destroyed, or whether their property was made useless or uninhabitable." <u>Id.</u> at 826-27.

- <u>TRAVCO Ins. Co. v. Ward</u>, 715 F. Supp. 2d 699 (E.D. Va. 2010), <u>aff'd</u>, 504 F. App'x 251 (4th Cir. 2013). The court held that "toxic gases released by" drywall is "direct physical loss" under the policy. <u>Id.</u> at 708-09. "If [the insurer] intended to define covered losses more narrowly, it should have done so more clearly. Having failed to do so, [the insurer] cannot now rewrite a policy it issued in hopes of avoiding the terms of an instrument it drafted." <u>Id.</u> at 709-10.

- <u>Gregory Packaging, Inc. v. Travelers Property Cas. Co.</u>, 2014 WL 6675934 (D.N.J. 2014). "Ammonia release" in the insured's building was held to be "direct physical loss of or damage to Covered Property" <u>Id.</u> at *1. "[T]he ammonia release physically transformed the air within [the covered property]

so that it contained an unsafe amount of ammonia or that the heightened ammonia levels rendered the facility unfit for occupancy until the ammonia could be dissipated." Id. at *6. "[T]he ammonia discharge inflicted 'direct physical loss of or damage to' [the Covered Property] . . . because the ammonia physically rendered the facility unusable for a period of time." Id.

- Cooper v. Travelers Indem. Co. of Illinois, 2002 WL 32775680 (N.D. Cal. 2002), aff'd, 113 F. App'x 198, 202 (9th Cir. 2004). A policy that "provides for coverage of 'direct physical loss of or damage to Covered Property at the premises" covered "presence of E-coli" at the Covered Property. Id. at *1-2.

- Columbiaknit, Inc. v. Affiliated FM Ins. Co., 1999 WL 619100 (D. Or. 1999). The court held that property with "pervasive, persistent or noxious odor" and "increased microbial counts and that will, as a result, develop either an odor or mold or mildew" may constitute "direct physical loss of or damage to" property. Id. at*4-5, 7. The court noted "physical damage can occur at the molecular level and can be undetectable in a cursory inspection." Id. at *6.

- Mellin v. Northern Security Insurance Company, Inc., 167 N.H. 544 (N.H. 2015). "[P]hysical loss may include not only tangible changes to the insured property, but also changes that are perceived by the sense of smell *and that exist in the absence of structural damage*," and that "a change rendered the insured property temporarily or permanently unusable or uninhabitable may support a finding that the loss was a physical loss to the insured property." Id. at 550 (emphasis added).

- Matzner v. Seaco Ins. Co., 9 Mass. L. Rptr. 41 (Mass. 1998). "[C]arbon-monoxide contamination constitutes 'direct physical loss of or damage to' property." Id. at *3-4. "[T]he phrase 'direct physical loss or damage' *is* ambiguous in that it is susceptible of at least two different interpretations. One includes only tangible damage to the structure of insured property. The second includes a wider array of losses. Following the rule of construction that an ambiguous phrase be accorded the interpretation more favorable to the insured, I adopt the latter interpretation." Id. (emphasis in original).

- Sentinel Management Co. v. New Hampshire Ins. Co., 563 N.W.2d 296 (Minn. 1997). An all-risk policy covering "direct physical loss to building(s)" covered the "release of asbestos fibers" that caused the presence of "asbestos fibers on carpeting and other surfaces" of the covered building. Id. at 298. "*Direct physical loss also may exist in the absence of structural damage to the insured property*." Id. at 300 (emphasis added). "Although asbestos contamination does not result in tangible injury to the physical structure of a building, a building's function may be seriously impaired or destroyed and the property rendered useless by the presence of contaminants." Id. Therefore, "contamination by asbestos may constitute a direct, physical loss to property under an all-risk insurance policy." Id. at 301; see also Gen. Mills, Inc. v. Gold Medal Ins. Co., 622 N.W.2d 147, 152 (Minn. Ct. App. 2001) ("direct physical loss can exist

without actual destruction of property or structural damage to property; it is sufficient to show that insured property is injured in some way").

- <u>Farmers Ins. Co. of Oregon v. Trutanich</u>, 123 Or. App. 6 (Or. 1993). The court held that a pervasive odor form methamphetamine lab that had infiltrated the covered property constituted "direct physical loss." <u>Id.</u>

- <u>Western Fire Ins. Co. v. First Presbyterian Church</u>, 165 Colo. 34 (Colo. 1968). "Direct physical loss" included "gasoline and vapors thereof" that "infiltrated and contaminated the foundation and halls and rooms of the" covered premises "making further use of the building highly dangerous." <u>Id.</u> at 36, 38-39. "[T]here was a direct physical loss occasioned to the church building" that "brings the insured within the 'all risk' coverage provided." <u>Id.</u> at 40.

In sum, at the time that the subject policies were issued in 2019 and/or 2020, numerous cases nationwide, spanning more than fifty (50) years: (i) rejected Defendants' argument that coverage for "direct physical loss of or damage to" property requires physical alteration to the property, and (ii) held that various substances, including disease- and illness-causing agents, are covered under policies containing the very language Defendants claim brings the instant loss outside the scope of coverage.

Against the weight of the *Analogous Cases* rejecting the argument that the Physical Loss Language requires physical alteration, Defendants point to three decisions that purportedly support their interpretation: <u>Universal Image Productions, Inc. v. Chubb Corp.</u>, 703 F. Supp. 2d 705, 709 (E.D. Mich. 2010); <u>Mama Jo's, Inc. v. Sparta Ins. Co.</u>, 2020 WL 4782369 (11th Cir. Aug. 11, 2020); <u>Mastellone v. Lightning Ros. Mut. Ins. Co.</u>, 884 N.E.2d 1130 (Ohio Ct. App. 2008). These cases do not overcome the weight of the *Analogous Cases* and do *not* support that "direct physical loss of or damage to" property requires physical alteration as a matter of law. <u>Id.</u>

For example, the <u>Universal Image</u> court considered whether a policy covering "direct physical loss or damage to building or personal property" covered "pervasive odor, mold and bacterial contamination." <u>Id.</u> at 709. After full fact-finding, the court granted the insured's motion for summary judgment, holding:

> [The insured] has not shown that it suffered any structural or any other tangible damage to the insured property. Rather, the bulk of [the insured's] argument relies upon proof that it suffered such intangible harms as strong odors and the presence of mold and/or bacteria in the air and ventilation system within its Building which, *in its judgment*, rendered the insured premises useless . . . . Although [The insured] cites testimony which indicates that the entire first floor of its insured premises had been engulfed by an appalling odor, *there is no evidence that this stench was so pervasive as to render the premises uninhabitable.* The Court also notes that [the insured's] own expert . . . did not even suggest that the entire premises be vacated[.]

Id. Thus, only after full discovery and fact finding, including expert discovery, did the court rule that there was "no evidence" of "direct physical loss or damage" because, *inter alia*, there was no evidentiary support for the conclusion that the premises was uninhabitable. Id.

On appeal, the Sixth Circuit affirmed because, *inter alia*, "[b]ased upon our detailed review of the record, . . . [the insured] has failed to present a genuine issue of material fact regarding the uninhabitability or usability of the [covered] building." Universal Image Productions, Inc. v. Fed. Ins. Co., 475 F. App'x 569, 574 (6th Cir. 2012). According to the court, "no expert recommended that [the insured] evacuate the building" and "there is no evidence in the record indicating that [the insured] was unable to remain in the [covered] building." Id.

Universal Image does not support dismissal of this lawsuit because the court did not hold "direct physical loss or damage to" property can only occur with structural alteration. Moreover, Universal Image, Mama Jo's, and Mastellone were decided on motions for summary disposition after full discovery and fact-finding, including expert opinion (or lack thereof), whereas Defendants bring the instant Motion to Dismiss pre-answer and pre-discovery.

Furthermore, Universal Image, Mama Jo's, and Mastellone do not win the day for Defendants because judgment as a matter of law may only be granted upon policy interpretation where the policy is not "subject to different reasonable interpretations[.]" Broome Cnty. v. The Travelers Indem. Co., 125 A.D.3d 1241, 1242 (3d Dept. 2015). Defendants cannot credibly argue

that the Policy is not subject to differing reasonable interpretations where numerous learned courts across the country read the exact provision at issue in Plaintiffs' favor for over fifty (50) years. At worst, an ambiguity exists precluding Defendants' Motion to Dismiss.

Pursuant to the above-cited *Analogous Cases*, interpreting the subject policy language, the Court should reject Defendants' claim that presence of COVID-19 is not, and cannot cause, physical loss or damage to the covered property, as a matter of law.

> 3. The case law cited by Defendants is inapplicable, distinguishable, and does not support that physical alteration of property is required by the Physical Loss Language.

Inexplicably, Defendants ignore Studio 417 and the *Analogous Cases*. Instead, Defendants erroneously cite two main cases to support its claim that that the Physical Loss Language requires physical alteration: SatisPie, LLC v. Travelers Property Casualty Company, --- F.Supp.3d ----, 2020 WL 1445874 (W.D.N.Y., March 25, 2020); and Newman Myers Kreines Gross Harris, P.C. v. Great Northern Ins., 17 F. Supp. 3d 323 (S.D.N.Y. 2014). Defendant also cites cases that specifically deal with COVID-19 insurance claims, even though they are distinguishable from the instant case and Studio 417 (collectively Defendants' "*COVID Cases*").[4]

SatisPie and Newman Myers are inapplicable and do not support dismissal. Unlike the *Analogous Cases*, neither case considers whether substances *at the covered property* can constitute direct physical damage or loss, and each one was decided at the summary judgment stage after fact

---

[4] Social Life Magazine, Inc. v. Sentinel Ins. Co., Ltd., (S.D.N.Y. Case No. 20-cv-3311); Diesel Barbershop, LLC v. State Farm Lloyds, 2020 WL 4724305 (W.D. Tex. Aug. 13, 2020); Rose's 1, LLC v. Erie Ins. Exch., (D.C. Super. Ct. Case No. 2020 CA 002424 B); 10E, LLC v. Travelers Indem. Co. of Conn., 2020 WL 5359653 (C.D. Cal. Sep. 2, 2020); Gavrilldes Mgmt. Co. v. Michigan Ins. Co., (Mich. Cir. Ct. File No. 20-258-CB); Turek Ents., Inc. v. State Farm Mut. Auto. Ins. Co., 2020 WL 5258484 (E.D. Mich. Sep. 3, 2020); Mudpie, Inc. v. Travelers Casualty Ins. Co. of Am., 2020 WL 5525171 (N.D. Cal. Sep. 14, 2020); Sandy Point Dental, PC v. Cincinnati Ins. Co., 2020 WL 5630465 (N.D. Ill. Sep. 21, 2020); Pappy's Barber Shops, Inc. v. Farmers Grp., Inc., 2020 WL 5500221 (S.D. Cal. Sep. 11, 2020).

finding. Rather, SatisPie and Newman Meyers concern whether the insureds' purported loss of use of covered property arising from damage and events outside and unrelated to the covered property can constitute physical loss of or damage to the covered property. See Newman Myers, 17 F. Supp. 3d at 330 (finding that the "forced closure of the premises [was] for reasons exogenous to the premises themselves."); SatisPie, 2020 WL 1445874, at *5 (finding no coverage because insured acknowledged the covered property was "not damaged" and "the loss was caused by its disposal of product that was *not contaminated*." (emphasis added)).

These decisions do not consider whether harmful substances—such as the Virus or other diseases- or illness-causing agents, such as e-coli, ammonia, asbestos, or mold—*present at the covered property* can constitute "direct physical loss of or damage to" the covered property.

In fact, in Newman Myers the court specifically analyzed certain of the *Analogous Cases* on which Plaintiffs rely: TRAVCO (noxious gas); Essex (unpleasant odor), and Hardinger (contamination of well water). See 17 F. Supp. 3d at 330. The Newman Meyers court did *not* find these *Analogous Cases* legally incorrect. Id. Rather, the court found the *Analogous Cases* factually distinguishable because in the *Analogous Cases* the presence of harmful substances at the covered property rendered the property "unusable or unsatisfactory for its intended purpose" and caused "direct physical loss or damage" to the property, despite the lack of "structural damage." Id. The Newman Meyers court further explained:

> In each there was some compromise to the physical integrity of the workplace. *To be sure, the cases involving odors, noxious fumes, and water contamination did not involve tangible, structural damage to the architecture of the premises. But the critical policy term at issue, requiring "physical loss or damage," does not require that the physical loss or damage be tangible, structural or even visible. The invasions of noxious or toxic gases in TRAVCO and Essex, rendering the premises unusable or uninhabitable, were held to suffice, because even invisible fumes can represent a form of physical damage*. The contamination of well water in *Hardinger*, similarly involved physical damage, just not structural—there, to the building's water supply.

Id. (emphasis added). This reasoning supports Plaintiffs' claims here.

The court found that rather than being akin to TRAVCO, Essex, and Hardinger, the Newman Myers case concerned the "forced closure of the premises for reasons exogenous to the premises themselves." Id. at 330. Thus, Defendants' cited legal authority is inapplicable.

The *COVID Cases* cited by Defendants are equally inapplicable.[5] Each of the *COVID Cases* presents a similarly inapplicable situation of either: (a) the insured failing to allege the presence of the Virus at their property; (b) the inclusion of a virus exclusion in the policy; and/or (c) not applying precedent and distinguishable New York law.

Indeed, the Mudpie and Turek decisions—while ultimately granting the insurers' motions to dismiss on distinguishable grounds—expressly contradict Defendants' arguments. The Mudpie court held that the Physical Loss Language "does not require a 'physical alteration of the property' or 'a *physical change* in the condition of the property.'" 2020 WL 5525171 at *4.

The Turek decision goes so far as to expressly distinguish itself from Studio 417 (which presents the same facts as here). 2020 WL 5258484 at *7. "Despite apparent similarities, *Studio* is readily distinguishable . . . . The Policy at issue in *Studio* covered losses arising from 'accidental physical loss *or* accidental physical damage to property." Id. (emphasis in original).

The Turek policy contained the phrase "physical loss *to*" instead of "physical loss *of*." Id. at *6. The court held that the insured's "interpretation would be plausible if, instead, the term at issue were 'accidental direct physical loss *of* Covered Property.'" Id. at *6 (emphasis in original).

---

[5]     Defendants' reliance on Social Life is misplaced. The insured sought a preliminary injunction for the immediate payment of its loss. In an oral decision from the bench, the court denied the insured's "motion for preliminary injunction." Thereafter, no decision or order was entered because, for unknown reasons, the lawsuit was dismissed and all pending motions were terminated pursuant to plaintiff's notice of dismissal, which was signed and "So Ordered."

"Furthermore, the *Studio* plaintiffs 'plausibly alleged that COVID-19 particles attached to and damaged their property," whereas the Turek insured "assert[ed] that COVID-19 never entered its premises[.]" Id. at *7.

Diesel Barbershop is inapplicable because (a) the court was not bound by governing New York law; and (b) the policy included a virus exclusion. 2020 WL 4724305 at *5. While the court found the "cases requiring tangible injury to property [] more persuasive[,]" id., it was not bound by the applicable New York decisions (Pepsico and Schlamm Stone) or the Second Circuit decision in Parks Real Estate, which govern the instant matter.

Additionally, Diesel Barbershop—as well as Gavrilldes, Turek, and Pappy—involved a policy that included the "virus and bacteria exclusion.". Diesel Barbershop, 2020 WL 4724305 at *6; Gavrilldes, (Mich. Cir. Ct. File No. 20-258-CB); Turek, 2020 WL 5258484 at *9-10; Pappy, 2020 WL 5500221 at *2. In other words, the insurers specifically did what Defendants here chose not to do: exclude virus-related losses from "physical loss of or damage to the property."

Moreover, the insureds in Gavrilldes, Rose's 1, 10E, Turek, Pappy, and Sandy Point did "not allege any physical loss of or damage to the property." Gavrilldes, (Mich. Cir. Ct. File No. 20-258-CB); see Rose's 1, (D.C. Super. Ct. Case No. 2020 CA 002424 B); 10E, 2020 WL 5359653 at *5; Turek, 2020 WL 5258484 at *7; Pappy, 2020 WL 5500221 at *2; and Sandy Point, 2020 WL 5630465 at *2. Here, Plaintiffs clearly alleged the presence of COIVD-19 at their premises and physical loss and/or damage to the same. (Doc. 1 [*Complaint*], ¶¶ 48-65).

Naturally, if insureds never had COVID-19 at their premises, they cannot be considered factually analogous cases to Plaintiffs. Therefore, none of the case law cited by Defendants is applicable and the Motion to Dismiss should be denied in its entirety.

## PLAINTIFFS STATE A VIABLE CLAIM FOR
## CIVIL AUTHORITY INSURANCE COVERAGE

Under the Policy's Civil Authority coverage, Defendants cover:

> the actual loss of Business Income [the insured] sustain[s] and necessary Extra Expense caused by action of civil authority that prohibits access to the described premises due to direct physical loss of or damage to property, other than the described premises, caused by or resulting from any Covered Cause of Loss.

(Doc. 1-2 [*Policy*], p. 76).[6] Notably, unlike many policies, Plaintiffs' Policy does not specify that the civil authority action must be made in response to damage to property *within a certain proximity* to Plaintiffs' property. Id. Rather, the civil authority action must merely be taken in response to damage to property, *generally*, other than Plaintiffs' property. Id.

COVID-19 was present at, in, throughout, and on Plaintiffs' premises, property other than Plaintiffs', and throughout New York State. (Doc. 1 [*Complaint*], ¶¶ 48-55). The presence of COVID-19 and the resulting damage to Plaintiffs' premises, property other than Plaintiffs' premises, and property throughout New York, caused civil authorities throughout New York to issue orders suspending business operations and prohibiting access to commercial property. Id.

Governor Cuomo issued executive orders declaring "a State disaster emergency for the entire State of New York," requiring the suspension of business and/or use of commercial property, and prohibiting access to commercial property. Pursuant to the NYS Shutdown Orders arising from the COVID-19 "disaster emergency," all non-essential businesses were required to reduce on-site workers by: (a) fifty percent (50%), effective March 20, 2020; (b) seventy-five percent (75%),

---

[6]     Defendants' arguments regarding Civil Authority Coverage and Sue & Labor Coverage are largely duplicative of the arguments addressed in POINT II—*to wit* that the Virus purportedly does not and cannot constitute "direct physical loss of or damage to" property. Thus, only the additional argument Defendants raise—that "Plaintiffs have alleged no facts establishing any loss or damage to property other than Plaintiffs'" (Doc. 12-7 [*Def. Mem. L.*], p. 12)—is addressed in POINT III.

effective March 21, 2020; and (c) one-hundred percent (100%), effective March 22, 2020 (all of the New York State Executive Orders arising from COVID-19, including the NYS Shutdown Orders, are collectively referred to as the "CA Orders"). (Berloth Decl. Exs. 14, 15, & 16).

Defendants erroneously assert that Plaintiffs' claim for Civil Authority coverage must be dismissed, as a matter of law, because (a) Plaintiffs failed to allege "damage to property other than property on the insured's premises," and (b) the CA Orders were not issued in response to property damage. Defendants' claims are meritless.

A.     **Plaintiffs satisfactorily allege damage to property other than property on the insured's premises.**

Defendants' ignore Plaintiffs' allegations in claiming that Plaintiffs did not allege damage to other property. Plaintiffs expressly allege that because COVID-19 is "ubiquitous," "it exists everywhere, including, without limitation, Plaintiffs' Premises and property in the immediate area of Plaintiffs' Premises," and "caused direct physical loss of or damage" to such property. (Doc. 1 [*Complaint*], ¶¶ 48-55); see also DeVito, 227 A.3d at 889-90 (rejecting claim that petitioner's business was not in the "COVID-19" "disaster area" declared due to COVID-19's "presence in and movement through Pennsylvania" because "any location (including Petitioners' businesses) where two or more people can congregate is within the disaster area.").

Notably, Plaintiffs' Policy does not require the extra condition that the civil authority action must be made in response to damage to property *within a certain proximity* to Plaintiffs' property. (Doc. 1-2 [*Policy*], p. 76). Thus, Defendants cannot avoid the indisputable fact that the Virus was present at properties throughout New York, and therefore, at property other than Plaintiffs'. Id.

B.     **The CA Orders were issued in response to property damage.**

Defendants erroneously assert that Plaintiffs failed to allege that the CA Orders were issued in response to damage to property. (Doc. 12-7 [*Def. Mem. L.*], p. 12). In fact, the very text of

certain CA Orders expressly support Plaintiffs' claim. For instance, the NYC Executive Orders, which were issued in relation to and to carry out the NYS Shutdown Orders, specifically declared, *inter alia*, that "this order is given . . . because the virus physically is causing property loss and damage." (Dkt. No. 9-6). Indeed, the initial NYS Shutdown Order itself expressly provides:

> Pursuant to Section 29 of Article 2-B of the Executive Law, I direct the implementation of the State Comprehensive Emergency Management Plan and authorize all necessary State agencies to take appropriate action to assist local governments and individuals in containing, preparing for, responding to and recovering from this state disaster emergency, *to protect state and local property*, and to provide such other assistance as is necessary to protect public healthy, welfare, and safety.

(Berloth Decl. Ex. 12 (emphasis added)).

Thus, Defendants cannot credibly claim at the motion to dismiss stage that the CA Orders were not issued in response to property damage. At a minimum, an issue of fact exists.

Simply put, as recently held in <u>North State Deli</u>, "Plaintiffs were forbidden from accessing and putting their property to use for the income-generating purposes for which the property was insured." (Ex. A). Therefore, Plaintiffs are entitled to coverage for the loss of business income during the period that the CA Orders prohibited access to the premises. At a minimum, Plaintiffs are entitled to discovery and an opportunity to prove their allegations that COVID-19 contaminated Plaintiffs' premises and property other than Plaintiffs' property, resulting in the CA Orders that prohibited access to Plaintiffs' premises. Those issues of material fact preclude judgment as a matter of law at this pre-discovery stage.

<u>POINT IV</u>

PLAINTIFFS STATE A VIABLE CLAIM UNDER NEW YORK GBL § 349

To make out a claim under New York General Business Law ("GBL") § 349, Plaintiffs are only required to allege (a) Defendants engaged in consumer-oriented activities, (b) those activities

were materially false or deceptive, and (c) such activities caused actual injury to Plaintiffs. See City of N.Y. v. Smokes-Spirits.Com, Inc., 12 N.Y.3d 616, 622-23 (N.Y. 2009).

**A.**    **Defendants' engaged in consumer-oriented activities in deciding to universally deny COVID-related claims regardless of the insureds' specific factual circumstances.**

To satisfy the consumer-oriented-activities element, Plaintiffs allege facts showing that Defendants' activities have implications for similarly situated consumers. Smokes-Spirits.Com, 12 N.Y.3d at 622-23. New York courts have identified three non-dispositive factors in determining whether a practice is consumer oriented: "1) the amount of money involved in the agreement; 2) the relative bargaining power and sophistication of the parties; and 3) the nature of the agreement." Warren v. Mariner Fin., LLC, 16-CV-221, 2020 WL 4676658, at *5 (W.D.N.Y. Aug. 12, 2020). Prior to addressing these three factors, Plaintiffs must dispel Defendants' erroneous implication that that insurance coverage disputes can never involve consumer-oriented activities.

1.    The instant case presents an insurance dispute involving consumer-oriented activities.

GBL § 349 is properly applied to insurance disputes akin to the instant case. See Riordan v. Nationwide Mutual Fire Ins. Co., 977 F.2d 47, 51-52 (2d Cir. 1992); cf. New York Univ. v. Cont. Ins. Co., 87 N.Y.2d 308, 321 (N.Y. 1995). The Second Circuit held that:

> By its own terms[], GBL § 349 applies to the acts or practices of every business operating in New York. . . . Nowhere does GBL § 349 provide an exception for insurance companies, nor does the Insurance Law exempt insurance companies from the reach of GBL § 349.

Riordan, 977 F.2d at 51-52.

Indeed, the New York Court of Appeals explained that a GBL § 349 claim will exist where a defendant's "acts or practices" have "a broad impact on consumers at large[.]" New York Univ., 87 N.Y.2d at 320. While many insurance disputes may constitute "essentially a 'private' contract

dispute over policy coverage and the processing of a claim which is unique to the[] parties," an insurance matter may still present consumer-oriented conduct "which affects the consuming public at large." <u>Id.</u> at 321. Thus, "relief under [GBL § 349] is not necessarily foreclosed by the fact that the transaction involved an insurance policy." <u>Id.</u>

Nonetheless, Defendants claim none of the acts Plaintiffs allege are consumer-oriented activities, because this lawsuit involves insurance coverage disputes that purportedly are unique to individual insureds and their insurers. Defendants are wrong.

Defendants' ask this Court to view this case in a complete vacuum and review only isolated allegations from Plaintiffs' Complaint. The Complaint must be read as a whole and construed liberally, with all facts alleged accepted as true, and all reasonable inferences drawn in Plaintiffs' favor. <u>La Liberte v. Reid</u>, 966 F.3d 79, 85 (2d Cir. 2020).

Defendants claim that the allegations set forth in the Complaint are unsupported by facts and otherwise set forth only a "garden variety" coverage dispute unique to the parties named on the policies of insurance at issue. Defendants' ignore the allegations in the Complaint that are inconvenient to their position. (<u>See</u> Doc. 1 [*Complaint*], at ¶¶ 66-106 (incorporating and re-stating all prior allegations of the Amended Complaint into the GBL § 349 claim)).

Even a cursory reading of the Complaint demonstrates this lawsuit presents anything but a "garden variety" coverage dispute. This lawsuit arose because Defendants made a systemic decision to (i) treat all of their consumer-insureds the exact same way and (ii) deny each and every COVID-related claim, regardless of the individual facts or circumstances presented by any individual insured. (<u>See</u> Doc. 1 [*Complaint*], ¶¶ 94-115 (alleging that Defendants failed to investigate the particular facts and circumstances of Plaintiffs' claims, and issued standard, form denial letters that did not discuss any facts particular to Plaintiffs)).

To be clear, this case does not involve a situation where Defendants (i) received a claim of property damage, (ii) investigated that insured's specific claim, and (iii) rendered a denial letter to the insured, citing fact-specific bases for the denial. This case involves Defendants' universal denial of all COVID-related claims based on Defendants' unilateral determination that it would not afford such coverage under the all-risk policies it issued under any circumstances. Id.

Simply put, one would be hard-pressed to imagine a more consumer-oriented activity in an insurance context than that alleged by Plaintiffs. See, e.g., id. at ¶7 (alleging that Defendants have stated none of their all-risk policies insure against any loss stemming from the ongoing global pandemic); id. at ¶¶ 31-47 (alleging the existence of the Virus Exclusion implemented by the insurance industry as a whole, and most notably, a virus exclusion used by Defendants in other policies, but not in Plaintiffs' Policy); id. at ¶¶ 66-93 (alleging that Defendants act uniformly, operate uniformly, and act for one another in virtually every respect); id. at ¶¶ 94-115 (alleging the uniform nature of Defendants' universal pre-claim-determination to deny COVID-related claims from their insureds, regardless of whether those insureds' all-risk insurance policies contained a virus exclusion; and producing and discussing the existence of documents substantiating those allegations and giving rise to a more-than-reasonable inference of Defendants' standardized practice and pre-determination of COVID-related claims handling).

2.  Defendants conduct was consumer-oriented due to the nature of the agreement, their use of uniform, standard forms, and Plaintiffs' lack of bargaining power.

Courts typically find that consumer-oriented activities involve: (a) disputes over "modest" sums of money (although "modest" is a subjective, moving target); (b) transactions where the parties have unequal bargaining power; and (c) standard forms issued by the defendant(s) to the consumer(s). Warren, 16-CV-221, 2020 WL 4676658 at *5.

To say that the bargaining power in the parties' relationships rests near-exclusively with the Defendants would be a drastic understatement. Indicative of that fact, is that the policies at issue were promulgated by Defendants, using standard forms that were drafted by Defendants and issued to Plaintiffs on a proverbial "take-it-or-leave it" basis. See Pan Am. II, 505 F.2d at 1002-03 (explaining that an insured may "negotiate the scope of its coverage, paying a larger or smaller premium according to whether the scope of coverage was more or less extensive, but it had *no significant control of the terms defining coverage*." (emphasis added)); Katz v. Am. Mayflower Life Ins. Co. of N.Y., 14 A.D.3d 195, 205 (1st Dept. 2004) ("the insured generally lacks the power to bargain for more favorable contract terms[.]"). While insureds may purchase different types of coverage, the forms used, terms therein, and types of coverage offered are dictated by Defendants.

Additionally, Defendants' coverage determinations, as well as the methods of distributing those determinations, are based on, and utilize, Defendants' standard forms and practices. (See Doc. 1-6 [*Denial*]). Defendants' standard-form denial letter sent to Plaintiffs do not reference any fact specific bases for the denials. Id. Instead, the denial letters evince a letter prepared for the masses that merely states there was no physical loss caused by the virus, so the claim is not covered—end analysis. See id.

Therefore, the Defendants' activities in responding to the Covid-19 pandemic and their insureds Covid-19-related claims were consumer-oriented activities.

**B.**     **Defendants' engaged in materially false and deceptive activities resulting in actual injury to Plaintiffs.**

Plaintiffs' allegations and the exhibits attached to the Complaint demonstrate that Defendants not only knew about the availability of an express virus exclusion—they actually used it in other instances. Thus, issuing all-risk policies to Plaintiffs and other insureds that did *not* contain express virus exclusions, only to then make the universal decision to treat those insureds

the same as policyholders *with a* virus exclusion, demonstrates that Defendants have materially misled and deceived its consumer base.

Defendants charged Plaintiffs and other insureds premiums for insurance policies that did not contain a virus exclusion, charged other policyholders premiums for policies that did contain a virus exclusion, and yet treated them all the same in denying coverage. Accordingly, Plaintiffs suffered actual demonstrable damages from Defendants' misleading and deceptive practices, including, but not limited to: (i) paying higher premium rates for policies with no virus exclusion; (ii) incurring legal costs and fees to rectify Defendants' deceptive practices; (iii) not being paid insurance proceeds to which they are entitled; and (iv) consequential damages resulting from Defendants' failure to pay those proceeds.

## POINT V

### PLAINTIFFS STATE VIABLE CLAIMS AGAINST PCH

Plaintiffs initiated this matter against Defendant PCH on multiple theories of liability, including: (a) that PCH is an actual party to the insurance contract at issue (see, e.g., Doc. 1 [*Complaint*], ¶¶ 67-68); and (b) under the agency doctrine (see Doc. 1 [*Complaint*], ¶¶ 66-93). Defendants submitted no documentation that would adequately support a pre-answer motion to dismiss Plaintiffs' allegations that PCH is a party to the insurance contract. Moreover, Defendants wholly failed to address Plaintiffs' allegations regarding the agency doctrine.

PCH's subsidiary insurance companies, including PIIC (the "Subsidiary Defendants") acted on behalf and at the direction and control of PCH, as their principal, pursuant to their actual and apparent authority, with regard to the insurance policies and wrongful conduct at issue in this lawsuit. (See Doc. 1 [*Complaint*] ¶¶ 66-93).

New York law is well settled that a parent can be held liable for actions taken by its subsidiary under traditional principles of agency. Importantly, whether such an agency relationship exists requires fact finding regarding the parent and subsidiary's relationship and conduct, which precludes dismissal at this stage.

> If such an agency arrangement is alleged . . . [t]he parent-principal should not be allowed to escape liability simply because it owns stock in the subsidiary-agent. Rather, as in any agency case, the issue should be one of authority: did the subsidiary have authority, actual or apparent, to act on behalf of the parent?

Royal Indus. Ltd. v. Kraft Foods, Inc., 926 F. Supp. 407, 413 (S.D.N.Y 1996).

> [T]o establish a parent's agency relationship with a subsidiary, traditional agency principles apply and there must be facts sufficient to show (1) the principal's manifestation of intent to grant authority to the agent, and (2) agreement by the agent.

> Such a relationship may arise from an agent's *"actual" or "apparent" authority*. "Actual authority 'is the power of the agent to do an act or to conduct a transaction on account of the principal which, with respect to the principal, he is privileged to do because of the principal's manifestations to him.'" Conversely, "[a]pparent authority arises from the 'written or spoken words or any other conduct of the principal which, reasonably interpreted, causes [a] third person to believe that the principal consents to have [an] act done on his behalf by the person purporting to act for him.

Harte v. Ocwen Financial Corporation, 2016 WL 1275045, *4-5 (E.D.N.Y. 2016) (internal citations omitted, emphasis added).

"An essential characteristic of an agency relationship is that the agent acts subject to the principal's direction and control." In re Shulman Transp. Enterprises, Inc., 744 F.2d 293, 295 (2d Cir. 1984); see In re Parmalat Securities Litigation, 594 F. Supp.2d 444, 451 (S.D.N.Y. 2009) (hereinafter "Parmalat II") (emphasis added).

> Commonly, an outsider will not be privy to the details of what conversation or conduct took place between a principal and the agent. *Thus, courts have recognized that to survive a motion to dismiss under 12(b)(6) on this issue, <u>a plaintiff need only raise[ ] a sufficient inference that some sort of agency relationship existed between the purported principal and agent</u>.*

Amusement Indus., Inc. v. Stern, 693 F. Supp. 2d 327, 344 (S.D.N.Y. 2010) (internal citations and quotations omitted, emphasis added).

"To adequately allege an actual agency relationship, *a plaintiff need only allege facts sufficient to support a reasonable inference of actual authority, and its pleadings may rely upon facts that would constitute circumstantial evidence of authority*." Skanga Energy & Mar. Ltd. v. Arevenca S.A., 875 F. Supp. 2d 264 (S.D.N.Y. 2012) (hereinafter "Skanga I"), aff'd, Skanga Energy & Mar. Ltd. v. Petroleos de Venezuela S.A., 522 F. App'x 88 (2d Cir. 2013) (hereinafter "Skanga II") (collectively "Skanga") (emphasis added).

A plethora of courts within the Second Circuit exemplify these very standards in factually analogous cases. See Skanga II, 522 F. App'x 88; Elbit Sys., Ltd. v. Credit Suisse Group, 917 F. Supp. 2d 217, 226 (S.D.N.Y. 2013); STMicroelectronics v. Credit Suisse Group, 775 F. Supp. 2d 525 (E.D.N.Y. 2011); Parmalat II, 594 F. Supp.2d at 446-47; In re Parmalat Sec. Litig., 375 F. Supp. 2d 278, 294 (S.D.N.Y. 2005) (hereinafter "Parmalat I") (Parmalat I and Parmalat II collectively referred to as "Parmalat").

In Skanga II, the Second Circuit held that the plaintiff "carried its burden of pleading that an agency relationship existed *by providing circumstantial evidence at the pleading stage to establish a reasonable inference of a . . . agency relationship*." 522 F. App'x at 90 (emphasis added). That circumstantial evidence included, *inter alia*, "the transaction documents . . . bearing [the purported principal's] logo." Id.

In Elbit, the Southern District of New York held that although the plaintiff "plausibly allege[d]" an agency relationship sufficient to defeat a motion to dismiss by asserting: (i) the parent and subsidiary shared managers; (ii) "executives overlapped"; and (iii) the parent "directed [the subsidiary's] response" to the event underlying the lawsuit. 917 F. Supp. 2d at 226.

In STMicroelectronics, the Eastern District of New York held the plaintiff sufficiently alleged any agency relationship where the parent: (i) "publicly [] described the New York headquarters of [its subsidiary] as a 'local office'"; (ii) "devis[ed] the incentive and compliance structures in place at [the subsidiary] and decid[ed] how to respond to customer complaints"; and (iii) "played a substantial role in the legal and risk management affairs of [the subsidiary]." Id. at 539. The Court held: "Although [the plaintiff's] agency theory may prove unfounded, '*questions as to the existence and scope of the agency are issues of fact and are not properly the basis of a motion to dismiss.*' The bones are enough for now; discovery may provide the meat." Id. at 540 (quoting Heredia v. United States, 887 F. Supp. 77, 80 (S.D.N.Y.1995) (emphasis added)).

The Parmalat Decisions are further examples of the Second Circuit's well-established law. In Parmalat, the plaintiffs, purchasers of fraudulent securities, filed a class action against a parent company, Deloitte Touche Tohmatsu ("DTT"), and one of its member firms, Deloitte & Touche, S.p.A. ("Deloitte Italy"), arising from Deloitte Italy's improper auditing of the purchased securities. Parmalat II, 594 F. Supp. 2d at 446-47; see Parmalat I, 375 F. Supp. 2d at 294.

In 2005, the court denied DTT's Rule 12(b)(6) motion to dismiss, finding that "Plaintiffs have adequately pleaded an agency relationship" between DTT and Deloitte Italy by alleging: (i) "Deloitte firms follow general professional standards and auditing procedures promulgated by DTT"; (ii) "Partners and associates of member firms participate in global practice groups and attend DTT meetings"; (iii) "[a]lthough various disclaimers on DTT's website indicate the legal separateness of DTT and its members, the firms market themselves under the name Deloitte, and DTT reports revenue for the firms on a combined basis"; (iv) "DTT advertises itself as a global network the member"; and (v) "Member firms use the Deloitte name and logos in bidding for and delivering contracted for service." Parmalat I, 375 F Supp 2d at 287-295.

In 2009, even post-discovery on a motion for summary judgment seeking dismissal of the agency claims, the court denied DTT's motion because the plaintiffs "point[ed] to numerous facts that could be taken as indicating that DTT structured and conducted itself in a manner that permitted it to exercise control over its member firms, including Deloitte Italy." Parmalat II, 594 F. Supp. 2d at 452. Those facts include:

- "Member firms . . . use the Deloitte name . . .in order to project the image of a cohesive international organization'";

- "DTT exercised substantial control over the manner in which the member firms conducted their professional activities," including the member firms "follow general professional standards and auditing procedures promulgated by DTT";

- "Partners and associates of member firms participate in global practice groups and attend DTT Meetings;"

- "DTT could arrange, with the approval of the transferring firm, for the transfer of employees from one member firm to another";

- "DTT played also a substantial role in the legal and risk management affairs of member firms."

- "[E]vidence that DTT exercised that authority in the specific context of the Parmalat engagement"—the transaction at issue in the lawsuit.

Id. at 447-453.

Here, Plaintiffs' alleged an agency relationship between PCH and the Subsidiary Defendants sufficient to defeat the pre-answer motion to dismiss. Indeed, Plaintiffs allegations include the same, and additional, allegations of control and complicity asserted to defeat dismissal in Skanga, Elbit, STMicroelectronics, and Parmalat. (See Doc. 1 [Complaint], ¶¶ 66-93).

In particular, Plaintiffs allege that PCH directs and controls all facets of its subsidiaries' business operations, including that: (a) PCH requires use of its uniform standards, policies, procedures, processes, methodologies, and forms for all aspects of the Subsidiary Defendants' business operations; (b) all financial and business reporting is done on a combined basis; (c) PCH

speaks on behalf of its subsidiaries in the media and public filings without distinction between any entities; (d) PCH and the Subsidiary Defendants have the same address and share offices, departments, staff, and technical and business management systems; (e) PCH portrays a single company to its customers; (f) all quotes and policies, payments, and claims processing and administration are done through PCH's centralized website and shared toll free numbers; (g) PCH and the Subsidiary Defendants use the "Philadelphia" name and "Cracked Liberty Bell" logo on all documents; (h) the subject policies were issued on PCH's standardized coverage forms; (i) Plaintiffs' claims were submitted through the universal PCH-created processes for submitting COVID-19 claims without regard to the name of the writing company; and (j) PCH controlled and directed the Subsidiary Defendants' response to COVID-19 insurance claims, including the denial of Plaintiffs' claims provided on standard PCH forms. Id. at ¶¶ 66-106.

Pursuant to the governing legal authority, Plaintiffs sufficiently stated claims against PCH based on its agency relationship with the Subsidiary Defendants. At a minimum, Plaintiffs' allegations raise inferences of an agency relationship sufficient to permit discovery on that issue. Therefore, PCH's motion to dismiss the claims against it must be denied because Plaintiffs adequately alleged an agency relationship between PCH and the Subsidiary Defendants.

**<u>CONCLUSION</u>**

For all of the reasons set forth in the foregoing arguments, Plaintiffs respectfully

requests that this Court deny Defendants Motion to Dismiss in its entirety.

Dated: Buffalo, New York
      October 22, 2020

                    DUKE HOLZMAN PHOTIADIS & GRESENS LLP

By:    /s/ *Christopher M. Berloth*
                      Charles C. Ritter, Jr.
                      Steven W. Klutkowski
                      Christopher M. Berloth
                      *Attorneys for Plaintiffs*
                      701 Seneca Street, Suite 750
                      Buffalo, New York 14210
                      critter@dhpglaw.com
                      sklutkowski@dhpglaw.com
                      cberloth@dhpglaw.com