UNITED STATES DISTRICT COURT
FOR THE
WESTERN DISTRICT OF NEW YORK

| | |
|---|---|
| KIM-CHEE LLC and YUP CHAGI INC. d/b/a MASTER GORINO'S PIL-SUNG TAE-KWON-DO,<br><br>Plaintiffs,<br><br>v.<br><br>PHILADELPHIA INDEMNITY INSURANCE COMPANY and PHILADELPHIA CONSOLIDATED HOLDING CORP. a/k/a PHILADELPHIA INSURANCE COMPANIES,<br><br>Defendants. | Case No. 1:20-cv-1136 |

**ORDER ON DEFENDANTS' MOTION TO DISMISS**
(Doc. 12)

Plaintiffs are business owners who seek to recover first-party insurance coverage under a commercial policy issued by defendant Philadelphia Indemnity Insurance Company. Their claim concerns business interruption losses due to occupancy limits imposed by New York State in an effort to reduce COVID-19 infection rates.

**A.      The Insurance Policy**

Plaintiffs operate a martial arts and fitness business in Buffalo, New York under the name "Master Gorino's Pil-Sung Tae Kwon-do." (Doc. 1-2 at 11.) In 2019, Plaintiffs obtained an insurance policy from defendants for the period June 5, 2019 – June 5, 2020 (the "Policy"). (Doc. 1-2 at 11.) The Policy includes a first-party commercial property component as well as general liability coverage. This case concerns claims for business interruption under the first-party coverage. Plaintiffs seek compensation for losses in revenue they sustained when their

business closed due to the COVID-19 pandemic and related executive orders in the spring of 2020.

The Policy includes a declarations section identifying the parties and listing the substantive provisions that define the scope and conditions of coverage. These provisions include the "Businessowners Special Property Coverage Form" describing the first-party coverage. The insurer promises to "pay for direct physical loss of or damage to Covered Property at the premises described in the Declarations caused by or resulting from any Covered Cause of Loss." (Doc. 1-2 at 21.) After defining the "covered property," the form defines "covered cause of loss" as "Risks of Direct Physical Loss unless the loss is a. Excluded in Section B., Exclusions; or b. Limited in Paragraph A.4, Limitations . . . ." (Doc. 1-2 at 22.)

The Policy provides for coverage of loss of business income as a result of a covered loss. (Doc. 1-2 at 24.) It provides:

> We will pay for the actual loss of Business Income you sustain due to the necessary suspension of your 'operations' during the 'period of restoration.' The suspension must be caused by direct physical loss of or damage to property at the described premises. The loss of damage must be caused by or result from a Covered Cause of Loss.

(*Id.*) The term "period of restoration" is defined in the Policy as "the period of time that: a. Begins: (1) 72 hours after the time of direct physical loss or damage for Business Income Coverage . . . caused by or resulting from any Covered Cause of Loss at the described premises" and ends at the resumption of business or a reasonable repair period. (*Id.* at 42.)

The Policy also provides for loss of business income as a result of "action of civil authority that prohibits access to the described premises due to direct physical loss of or damage to property, other than at the described premises, caused by or resulting from any Covered Cause of Loss." (Doc. 1-2 at 76.)

### B.      Plaintiffs' Allegations of Direct Physical Loss or Damage

The complaint alleges "Covered Loss" as follows:

- Plaintiffs' employees, customers and vendors were exposed to the virus, became ill, and were instructed by civil authorities to self-isolate and suspend business operations. (Doc. 1 ¶ 48.)

- The insured property was exposed to the virus and closed due to orders of the civil authorities. (Doc. 1 ¶¶ 49, 59.) These orders prohibited Plaintiffs' access to the insured property.

- Property in the vicinity of the insured premises was also exposed to the virus and closed by the authorities. (Doc. 1 ¶ 50.)

- The virus is "ubiquitous, such that it exists everywhere," including the insured property and other properties within a mile. (Doc. 1 ¶¶ 51–52.)

- The presence of the virus causes direct physical loss and/or damage to the insured property. (Doc. 1 ¶¶ 53–54, 58.)

- As a result of the virus and related governmental orders, plaintiffs ceased business operations in March 2020. (Doc. 1 ¶ 62.)

In the response to the motion to dismiss, Plaintiffs provide additional information about the transmission of the virus. (Doc. 17-26.) Plaintiffs cite a variety of studies showing that the virus spreads through human respiration. An infected person may exhale droplets which travel through the air before settling on surfaces. The virus may remain viable for as long as four days. The risk of infection is higher in buildings than in the open air. (Doc. 17-26 ¶¶ 7–8.) For purposes of the motion to dismiss, the court accepts this additional information as true. While exceeding the allegations in the complaint, it is not contested as a factual matter by the

Defendants and it is consistent with guidance provided by the Centers for Disease Control. *See, e.g.*, Ctrs. for Disease Control, *Science Brief: Sars-CoV-2 and Potential Airborne Transmission*, available at https://www.cdc.gov/coronavirus/2019-ncov/science/science-briefs/scientific-brief-sars-cov-2.html (last accessed April 2, 2021).

## Analysis

### I. What Law Governs

The substantive law of New York, including decisional law, governs this diversity action. The court follows the choice of law principles of New York as the forum state. *Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487 (1941). The New York Court of Appeals has long followed the "center of gravity" test in identifying the jurisdiction whose substantive law governs contract disputes. *Auten v. Auten*, 308 N.Y. 155 (1954). "This approach generally dictates that a contract of liability insurance be governed by the law of the state which the parties understood to be the principal location of the insured risk . . . unless with respect to the particular issue, some other state has a more significant relationship . . . to the transaction and the parties." *Certain Underwriters at Lloyd's, London v. Foster Wheeler Corp.*, 822 N.Y.S. 2d 30 (N.Y. App. Div. 2006), *aff'd*, 9 N.Y.3d 928 (2007) (cleaned up). Here, the policy was issued to a New York insured and New York law applies.

### II. Coverage for Direct Physical Loss of or Damage to Property

This case presents a single issue: was the closure of Plaintiffs' business due to the COVID-19 pandemic caused by direct physical loss of or damage to the insured property? If Plaintiffs have suffered such a loss, the Policy provides for reimbursement of lost business income. An interruption of their business by events not reasonably described as direct physical loss would not qualify for coverage.

Plaintiffs make two principal arguments in favor of coverage. First, they contend that the policy provides "all-risk" coverage which protects them against any loss not expressly excluded or limited in subsequent provisions of the policy. Second, they argue that Defendants' failure to include an exclusion of loss due to virus or bacteria in the policy language is evidence of the parties' intent to cover loss or damage resulting from a pandemic.

### A.   Scope of Coverage

Plaintiffs are correct that the Policy is described in insurance circles as "all-risk." The alternative is a "'named perils' or 'specific perils' [policy] that provide[s] coverage only for the specific risks enumerated in the policy and exclude[s] all other risks." *Couch on Insurance (Third Edition)* § 101:7. But "[i]t has long been recognized . . . that 'all-risk' does not mean all-loss.'" *City of Burlington v. Indemnity Ins. Co. of N. Am.*, 332 F.3d 38 (2d Cir. 2003) (latent defects excluded under Vermont law). Instead, "all-risk" means any risk of the type for which the Policy provides coverage. In this case, coverage is limited to events causing "direct physical loss of or damage to [the covered] property." The scope of coverage depends on the meaning of that phrase.

Defendants rely on the definitions of "coverage" and "covered cause of loss" as a basis for their denial of coverage. Both of these terms restrict payment under the Policy to incidents of direct physical loss or damage. The opening sentence of "Subsection A Coverage" restricts the insurer's obligation to pay to "direct physical loss of or damage to Covered Property . . . caused by or resulting from any Covered Cause of Loss." (Doc. 1-2 at 21.) "Covered Causes of Loss" are defined at subsection A(3) as "Risks of Direct Physical Loss [unless otherwise excluded]." (*Id.* at 22.) The parties disagree about whether the spread of the COVID-19 pandemic and the resulting closure of Plaintiffs' business can be reasonably described as a direct physical loss.

The court starts by considering the losses alleged in the Complaint. Plaintiffs allege that the COVID-19 virus became "ubiquitous, such that it exists everywhere, including, without limitation, Plaintiffs' Premises and property in the immediate area of Plaintiffs' Premises." (Doc. 1 ¶ 51.) Plaintiffs' employees, customers and vendors were exposed to the virus, became infected, and were instructed by civil authorities to "self-isolate, quarantine, and/or suspend normal business operations." (Doc. 1 ¶ 48.) As a consequence, Plaintiffs were unable to use or operate their business. The complaint describes the sequence of executive orders issued by Governor Cuomo ordering the dismissal of on-site workers at non-essential businesses.

These allegations—which are consistent with the experience of the rest of the nation during 2020-2021—establish that the pandemic resulted in the closure of multiple businesses, including Plaintiffs'. Because the virus is invisible, it may be difficult to establish at trial whether Plaintiffs' dojo was actually infected with particles of the virus. But for purposes of the motion to dismiss, the court accepts the allegations in the Complaint as true, including the allegations that the virus was present within Plaintiffs' property. There is little doubt that Plaintiffs' business was shuttered along with thousands of others in New York State alone.

This case is scarcely the first New York business interruption case to result from the COVID-19 pandemic. In an unbroken line of trial court decisions, federal courts applying New York law have ruled that the closure of businesses due to the suspected presence of the virus or due to New York State executive orders do not qualify as direct physical loss or damage. *See Jeffrey M. Dressel, D.D.S., P.C. v. Hartford Ins. Co. of the Midwest, Inc.*, No. 20-CV-2777(KAM)(VMS), 2021 WL 1091711 (E.D.N.Y. Mar. 22, 2021); *Sharde Harvey, DDS, PLLC v. Sentinel Ins. Co.*, No. 20-CV-3350 (PGC) (RWL), 2021 WL 1034259 (S.D.N.Y. Mar. 18, 2021); *Food for Thought Caterers Corp. v. Sentinel Ins. Co.*, No. 20-cv-3418 (JGK), 2021 WL

860345 (S.D.N.Y Mar. 6, 2021); *Demoura v. Continental Cas. Co.*, No. 20-CV-2912 (NGG) (SIL), 2021 WL 848840 (S.D.N.Y. Mar. 5, 2021); *Michael J. Redenburg, Esq. PC v. Midvale Indem. Co.*, No. 20 Civ. 5815 (PAE), 2021 WL 276655 (S.D.N.Y. Jan. 27, 2021); *10012 Holdings, Inc. v. Sentinel Ins. Co.*, No. 20 Civ. 4471 (LGS), 2020 WL 7360252 (S.D.N.Y. Dec. 15, 2020); *Michael Cetta, Inc. v. Admiral Indem. Co.*, No. 20 Civ. 4612 (JPC), 2020 WL 7321405 (S.D.N.Y. Dec. 11, 2020); *Tappo of Buffalo, LLC v. Erie Ins. Co.*, No. 20-CV-754V(Sr), 2020 WL 7867553 (W.D.N.Y. Dec. 29, 2020); *Social Life Magazine, Inc. v. Sentinel Ins. Co.*, No. 20 Civ. 3311(VEC), 2020 WL 2904834 (S.D.N.Y. May 14, 2020). In addition, a New York Supreme Court decision reaches the same conclusion. *Visconti Bus Serv., LLC v. Utica Nat'l Ins. Grp.*, No. EF005750-2020, 2021 WL 609851 (N.Y. Sup. Ct. Feb. 12, 2021).

The analysis in each of these cases follows similar steps:

1. The court applies traditional principles of contract interpretation in seeking "to give effect to the intent of the parties as expressed in the clear language of the contract." *Morgan Stanley Grp. Inc. v. New England Ins. Co.*, 225 F.3d 270, 275 (2d Cir. 2000).

2. The phrase "direct physical loss or damage" is unambiguous. It requires physical damage to the insured property itself as a condition for coverage. *Roundabout Theatre Co. v. Continental Cas. Co.*, 751 N.Y.S. 2d 4, 8 (N.Y. App. Div. 2002) (no coverage for property damage at neighboring property resulting in street closure). Courts commonly require proof of a change or alteration of the insured structure or property to establish that it suffered damage or loss. *Iannucci v. Allstate Ins. Co.*, 354 F. Supp. 3d 125, 140 (N.D.N.Y. 2018).

3. The presence of the COVID-19 virus in the air or on surfaces of a covered property does not qualify as damage to the property itself. The virus is short-lived—if "life" is the

7

correct expression—and is rendered harmless by the passage of a few days of exposure to the environment.

4. Because the presence of the virus does not alter the covered property, it is different from radiation, chemical dust and gas, asbestos and other contaminants which may persist and damage the covered property.

5. Governmental orders which restrict access to property do not give rise to a covered loss unless they result from an incident of direct physical loss or damage which is itself a basis for insurance coverage.

The court adopts the same reasoning. Accepting as true the allegations in the Complaint, Plaintiffs were unable to operate their building or enter the premises because of the risk of infection and the enforcement of emergency health orders. Virus particles may have circulated in the air within the insured premises and settled on the exposed surfaces. These particles multiply within a host such as a human being, but they do not last long on their own in the atmosphere. They are invisible. They do not alter the characteristics of the covered property in any way except that their presence creates a health risk for humans who enter the premises. The building itself remains unharmed by the virus and would be safe for occupancy except for the arrival of people who bring new sources of infection.

The denial of coverage is consistent with state and federal cases interpreting the direct physical loss requirement. The leading New York state court case remains *Roundabout Theatre Co. v. Continental Casualty Co.*, 751 N.Y.S. 2d 4 (N.Y. App. Div. 2002). The collapse of a construction elevator on West 43rd street resulted in the closure of the street for a month and the cancellation of 35 performances of *Cabaret* at the Roundabout Theatre. The court held that "the language in the instant policy clearly and unambiguously provides coverage only where the

insured's property suffers direct physical damage." *Id.* at 8. The court rejected the argument that the use of the words *loss* and *damage* created ambiguity concerning the meaning of loss. "'[L]oss of' could refer to the theft or misplacement of theatre property that is neither damaged nor destroyed, yet still requires the cancellation of performance." *Id.* at 7. Whether the incident is described as *loss* or as *damage*, it is covered only if it affects the property insured under the policy.

In *Roundabout*, there was no dispute that physical loss or damage had caused the business interruption. The claim failed because the incident damaged the neighboring property, not the insured property. This case concerns allegations that the virus contaminated the insured property itself (as well as everywhere else.) The court turns to cases around the country which consider whether contamination is itself a direct physical loss.

Contamination of a structure that seriously impairs or destroys its function may qualify as direct physical loss. The first American case to reach this conclusion was *Western Fire Ins. Co. v. The First Presbyterian Church*, 165 Colo. 34, 437 P.2d 52 (1968) (seepage of gasoline onto insured property). *See* Scott Johnson, *What Constitutes Physical Loss or Damage in a Property Insurance Policy?* 54 Tort Trial & Insurance Practice Law Journal (2019). Other cases holding that the intrusion of chemicals or other contaminants may constitute a direct physical loss followed. *See Sentinel Mgmt. Co. v. New Hampshire Ins. Co.*, 563 N.W. 2d 296 (Minn. 1997) (release of asbestos fibers); *United States Fidelity & Guar. Co. v. Wilkin Insulation Co.*, 144 Ill. 2d 64 (1991) (asbestos); *Farmers Ins. Co. of Or. v. Trutanich*, 858 P.2d 1332 (Or. App. 1993) (pervasive odor from methamphetamine lab); *Widder v. La. Citizens Prop. Ins. Corp.*, 82 So. 3d 294 (La. Ct. App. 2011) (intrusion of lead rendering a home uninhabitable was a direct physical loss). In these cases, the structure of the building remained intact, but the building was rendered

unfit for occupancy due to health risks. Other contaminants whose presence caused physical loss or damage include ammonia, *Gregory Packaging, Inc. v. Travelers Prop. Cas. Co. of Am.,* No. 2:12-cv-04418 (WHW) (CLW), 2014 WL 6675934 (D. N.J. Nov. 25, 2014) (one-week shutdown of packaging facility); odor of cat urine, *Mellin v. Northern Sec. Ins. Co.*, 115 A.3d 799 (N.H. 2015) (remanded for further fact-finding); carbon monoxide, *Matzner v. Seaco Ins. Co.*, No. 96-0498-B, 1998 WL 566658 (Mass. Super. Aug. 12, 1998); e-coli bacteria in well, *Motorists Mut. Ins. Co. v. Hardinger*, 131 F. App'x 823 (3d Cir. 2005) (remanded for determination of whether functionality of insured's home was eliminated or property made useless); and wildfire smoke and ash, *Oregon Shakespeare Festival Ass'n v. Great Am. Ins. Co.*, No. 1:15-cv-01932, 2016 WL 3267247 (D. Or. June 7, 2016), *vacated at parties' request*, No. 1:15-CV-01932-CL, 2017 WL 1034203 (D. Or. Mar. 6, 2017).

Other cases have concluded that contamination which is short-lived or does not prevent the use of the structure does not qualify as direct physical loss. In *Mama Jo's, Inc. v. Sparta Ins. Co.,* 823 F. App'x 868 (11th Cir. 2020), *cert. denied*, 2021 WL 1163753 (Mar. 29, 2021), the intrusion of dust from road construction did not qualify as a direct physical loss because the property merely needed cleaning. *See also Universal Image Prods., Inc. v. Federal Ins. Co.*, 475 F. App'x 569 (6th Cir. 2012) (mold and bacteria requiring cleaning did not constitute physical loss or damage); *Mastellone v. Lightning Rod Mut. Ins. Co.*, 884 N.E.2d 1130, 1144 (Ohio Ct. App. 2008) (cleaning mold with bleach did not establish physical loss). Multiple courts, including the Third Circuit, have declined to characterize the presence of asbestos within a structure as physical loss or damage when the function of the building has not been eliminated. *See Port Auth. of N.Y. and N.J. v. Affiliated FM Ins. Co.*, 311 F.3d 226, 236 (3d Cir. 2002) ("When the presence of large quantities of asbestos in the air of a building is such as to make the

structure uninhabitable and unusable, then there has been a distinct loss to its owner. However, if asbestos is present in components of a structure, but is not in such form or quantity as to make the building unusable, the owner has not suffered a loss."); *Yale Univ. v. Cigna Ins. Co.*, 224 F. Supp. 2d 402, 413 (D. Conn. 2002) (similar).

From these cases that have both found and denied first-party coverage, the court identifies two complementary principles. First, since the *Western Fire Insurance* case, courts have consistently ruled that contamination by a persistent chemical or biological agent, not otherwise excluded from coverage, may cause a direct physical loss if it renders the insured property unusable. This principle applies even though the contamination may be gaseous, microscopic, or invisible. Covered losses are not confined to the obvious physical changes to a building caused by fire or bad weather.

Second, contamination that is temporary, like the road dust in the *Mama Jo's* decision, or that imposes remediation costs without preventing use of the building, like the asbestos in *Yale University v. Cigna Insurance Co.*, is unlikely to qualify as a direct physical loss to the insured premises. This does not mean that the contamination is not expensive to remove or serious in its health risks. Rather, courts have recognized that first-party coverage responds to physical damage to the insured property and not to all forms of loss or expense experienced by the property owner.

These principles are not inconsistent. They mark two ends of a spectrum extending from the easily remedied intrusion of road dust and ending with the persistent hazard of gasoline seepage. At one end, it is obvious that no direct physical loss or damage has occurred. The foreign substance is temporary and does not prevent use of the structure. At the other, few would

11

question that although the building is still standing, it has been rendered unusable because of the risk of fire or explosion.

Reduced to its essentials, the Complaint alleges that the virus has become widespread and that governmental orders in New York State have led to business closures by sharply reducing occupancy. This claim—which can hardly be contested—falls short of the requirements of a direct physical loss or damage to the premises. Unlike the cases of gasoline infiltration, cat urine, lead dust, and the other noxious substances which courts have found to constitute direct physical losses, there is no allegation of persistent contamination rendering the structure unusable. Instead, the claim is one of contamination—relatively short in duration but always with the risk of returning—which affects all structures and, indeed, all places in the world. According to Plaintiffs' briefing, the virus dies after four days on a surface. It presents a mortal hazard to humans, but little or none to buildings which remain intact and available for use once the human occupants no longer present a health risk to one another.

In the absence of plausible allegations that the virus persists within insured premises in the manner of gasoline or other contaminants, the reduction in business activity mandated by the state shutdown orders is best described as an instance of widespread economic loss due to restrictions on human activities, not the consequence of a direct physical loss or damage to the insured premises.

### B.  Extended coverage

The Policy contains three types of extended coverage: business income, extra expense, and civil authority. The business income and extra expense coverage both require proof of direct physical loss or damage. The relevant language in the business income clause provides:

> We will pay for the actual loss of Business Income you sustained due to the necessary suspension of your "operations" during the "period of restoration." The

> suspension must be caused by direct physical loss of or damage to property at the described premises.

(Doc. 1-2 at 24.) The "extra expense" coverage contains a similar requirement:

> We will pay necessary Extra Expense you will incur during the "period of restoration" that you would not have incurred if there had been no direct physical loss or damage to property at the described premises.

(*Id.* at 25.) Both provisions may increase the types of payments for which the insurer is responsible. They do not change the requirement found throughout the first-party coverage portion of the Policy that the loss result from direct physical loss or damage to the insured property.

In contrast to the business income and extra expense provisions, the civil authority coverage expands the scope of the events giving rise to coverage—but not by enough to save Plaintiffs' claim. The civil authority coverage provides:

> We will pay for the actual loss of Business Income you sustain and necessary Extra Expense caused by action of civil authority that prohibits access to the described premises due to direct physical loss of or damage to property, other than at the described premises, caused by or resulting from any Covered Cause of Loss.

(*Id.* at 26.) A street closure order of the type described in the *Roundabout* case could trigger coverage under this provision. Such a claim would arise from action prohibiting access to the insured premises due to direct physical loss or damage to other property. So long as the damaging event such as a fire or accident would be covered if it had occurred at the insured premises, the property owner—denied access to his business location—could be covered.

Plaintiffs cannot satisfy the requirements for this expanded coverage. Devastating as the closure has been to Plaintiffs and thousands of other businesses, Plaintiffs cannot provide specific, non-general allegations that document a direct physical injury to property (not theirs) that gave rise to the civil authority orders. They do not allege that the executive orders were triggered by "direct physical loss or damage to other property." They allege something less: "The

13

[civil authority] Orders prohibited access to the covered properties as a result of the damage and the ongoing and continuous loss and damage resulting from the Virus." Although they provide an allegation tailored to the coverage requirement that "Plaintiffs suffered a direct physical loss of or physical damage to Covered Property, including the [bodily injury] Losses, as a result of the Virus, CV-19 and the CA Orders," they can provide no specific allegations concerning physical damage to any property.

### C. The Missing "Virus Exclusion"

Plaintiffs' final argument is that Defendants failed to include an ISO standard-form exclusion for loss caused by virus or bacteria. The availability of such a form and its use in other policies is evidence, in Plaintiffs' view, of Defendants' intent to include coverage for loss due to virus in the Policy.

Use of the virus exclusion would have made Defendants' task easier. It would have eliminated coverage in a case in which a microbiologic agent causes damage to the insured property by taking up permanent residence in the manner of mold, radiation, or bacteria which may infect a building's cooling system. *A fortiori*, it would also remove doubt in a case in which a virus may be present for a short time within a building before ending its existence.

But omitting an ISO exclusion does not increase the available coverage—at least in the absence of ambiguity. The language of the direct physical loss clause is unambiguous. That does not mean that it does not require judgment to decide when damage to a building through contamination constitutes a direct physical loss. Courts have applied the policy language to a wide range of possible contaminants and have reached different results. But these differences arise from the facts of the cases and in particular the nature of the contamination and its persistence within the insured structure, not from the use of vague or uncertain policy language.

In the absence of ambiguity, the court has no cause to apply maxims of construction. *Universal Am. Corp. v. Nat'l Union Fire Ins. Co.*, 37 N.E.3d 78, 80 (N.Y. 2015).

Defendants' decision to forego the virus exclusion does not alter the limits the direct physical loss clause places on the coverage.

### III.   N.Y. General Business Law § 349

New York Gen. Bus. Law § 349 prohibits "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state." N.Y. Gen. Bus. Law § 349(a). The New York Court of Appeals has recognized that § 349 "on [its] face appl[ies] to virtually all economic activity, and [its] application has been correspondingly broad." *Plavin v. Grp. Health Inc.*, 146 N.E.3d 1164, 1168 (N.Y. 2020). To establish a violation of § 349, a plaintiff must establish, "first, that the challenged act or practice was consumer-oriented; second, that it was misleading in a material way; and third, that the plaintiff suffered injury as a result of the deceptive act." *Stutman v. Chem. Bank*, 731 N.E.2d 608, 611 (N.Y. 2000).

Plaintiffs argue that Defendants' marketing of their insurance policy was deceptive. Specifically, Plaintiffs contend that "Defendants expressly misrepresented to their policyholders that coverage decisions would be made on a case-by-case basis given the factual circumstances or policy provisions of individual policyholders." (Doc. 1 ¶ 139.) Plaintiffs argue that the absence of the ISO virus exclusion from their policy should have caused Defendants to process Plaintiffs' COVID-19 business interruption claims differently than claims submitted by policyholders whose policies included the virus exclusion. (*Id.* ¶¶ 146–154.) Construed most favorably to Plaintiffs, the Complaint alleges that Defendants marketed, and Plaintiffs purchased, insurance coverage only to be denied the apparent benefit of that coverage when they filed a claim.

Marketing insurance that an insurer does not intend to provide may be deceptive within the meaning of § 349. *Shapiro v. Berkshire Life Ins. Co.*, 212 F.3d 121, 127 (2d Cir. 2000); *DiDonato v. INA Life Ins. Co.*, No. 99 CIV. 470(JSM), 1999 WL 436444, at *1 (S.D.N.Y. June 24, 1999). However, the Complaint does not plausibly allege that Plaintiffs suffered an injury as a result of Defendants' materially misleading marketing and sale of their insurance policy, as required to state a claim under § 349. The court has already determined that the absence of the ISO virus exclusion is not relevant to the processing of Plaintiffs' claim. Plaintiffs have not, and cannot, plausibly allege that they were denied coverage because Defendants improperly processed their claim alongside the claims of policyholders whose policies contained the ISO virus exclusion. Instead, Plaintiffs cannot recover lost business income under their policy because they cannot establish that they suffered "direct physical loss or damage." Because the Complaint does not, and cannot, plausibly allege the second and third elements of a claim under N.Y. Gen. Bus. Law § 349, Plaintiffs' claim must be dismissed.

## Conclusion

Defendants' motion to dismiss (Doc. 12) is GRANTED.

Dated this 22nd day of April, 2021.

_____
Geoffrey W. Crawford, Judge
United States District Court